MICHIGAN TOWING ASSOCIATION, INC., *v.* CITY
OF DETROIT.

1. CARRIERS—COMMON CARRIERS—MUNICIPAL CORPORATIONS—ORDI-
NANCES.

A common carrier who holds a certificate of necessity from the
public service commission is, nevertheless, subject to ordi-
nances enacted by the municipalities in the exercise of their
right of reasonable control of their streets (Const 1908, art 8,
§ 28; CL 1948, § 475.1 *et seq.*, as amended; Detroit Ordinance
No 348-F).

2. MUNICIPAL CORPORATIONS—ORDINANCES—EXPRESSWAYS—TOWING
DISABLED VEHICLES.

Home-rule city ordinance prohibiting the towing of vehicles on
expressways within the city from 6 to 9 a.m. and from 3 to
7 p.m. except towing of vehicles disabled on the expressway
to nearest exit ramp *held,* not invalid as being outside the
power of the city to enact, especially where the State has not
intervened nor made known any objection to the ordinance in
question (Const 1908, art 8, § 28; Detroit Ordinance No 348-F).

3. SAME—CONSTITUTIONAL LAW—CONTROL OVER STREETS.

The reasonable control of streets accorded to home-rule cities
under the Constitution does not give them exclusive control,
the reasonableness of such control not being within the final
determination of the city in all cases, but determinable in
some instances in accordance with the legislature's interpreta-
tion, if it can be approved by the court, but such reasonable

REFERENCES FOR POINTS IN HEADNOTES
[1, 4] 9 Am Jur, Carriers § 40 *et seq.*
37 Am Jur, Municipal Corporations § 314.
[2, 3, 6–8] 37 Am Jur, Municipal Corporations § 314.
[5, 10] 25 Am Jur, Highways § 163 *et seq.*
[9, 11] 37 Am Jur, Municipal Corporations § 178.
[12, 13] 37 Am Jur, Municipal Corporations § 155 *et seq.*
[14] 37 Am Jur, Municipal Corporations §§ 187–193.
[15] 14 Am Jur, Costs § 91.

control may not be taken from them by the courts, by individuals, by administrative bodies, or by the legislature (Const 1908, art 8, § 28; Detroit Ordinance No 348-F).

4. SAME—CONTROL OF STREETS—COMMON CARRIERS.

The streets of a city belong to the public, and for ordinary use and general transportation and traffic they are free and common to all, and any control sought to be exercised over them by the city must be such as will not defeat or seriously interfere with their enjoyment, but common carriers have no right to such use for private gain without the consent of the city (CL 1948, § 475.1 *et seq.*, as amended).

5. SAME—DISTINCTION BETWEEN USE OF STREETS BY PUBLIC AND FOR BUSINESS USE.

The distinction between the use of streets by the public in the usual way for pleasure or business and as a place or instrumentality for business for private gain is fundamental, and while, as to the former, the power to regulate must be sparingly exercised and only when necessary in the public interest, as to the latter the right to use may be given or withheld.

6. CONSTITUTIONAL LAW—LEGISLATURE—MUNICIPAL CORPORATIONS—EXPRESSWAYS—STATUTES.

The legislature may not deprive a municipality of the right to reasonable control over its streets, even expressways within its limits, and, to the extent that a statute does so, it is invalid (Const 1908, art 8, § 28).

7. SAME—CONTROL OF STREETS.

City authorities may control, within reason, the use of their streets for any purposes whatsoever not inconsistent with the State law (Const 1908, art 8, § 28).

8. MUNICIPAL CORPORATIONS—ORDINANCES—EXPRESSWAYS—TOWED VEHICLES.

The reasonable control of streets accorded municipalities by the Constitution empowers a home-rule city to protect drivers of vehicles by the enactment of an ordinance prohibiting the towing of vehicles on expressways during hours from 6 to 9 a.m. and from 3 to 7 p.m. except towing of vehicles disabled on the expressway to the nearest exit ramp, thereby eliminating a distraction and diminishing the danger of accidents (Const 1908, art 8, § 28; Detroit Ordinance No 348-F).

9. SAME—ORDINANCES—BURDEN OF PROOF.

One claiming an ordinance is arbitrary, unreasonable, or discriminatory has the burden of so showing.

10. CONSTITUTIONAL LAW—COURTS—MUNICIPAL CORPORATIONS—CONTROL OF STREETS.

The Supreme Court will not ordinarily substitute its judgment for that of a home-rule city as to the reasonable control of its streets (Const 1908, art 8, § 28; Detroit Ordinance No 348-F).

11. MUNICIPAL CORPORATIONS—ORDINANCES—EXPRESSWAYS—TOWING DISABLED VEHICLES DURING RUSH HOURS.

Plaintiff association of tow truck owners seeking to have declared invalid home-rule city's ordinance prohibiting the towing of disabled vehicles on expressways within the city during hours from 6 to 9 a.m. and from 3 to 7 p.m. except towing vehicles disabled on the expressways to nearest exit ramp, *held*, not to have sustained their burden of proof that the ordinance was invalid, since they may yet drive their tow trucks thereon without towing vehicles at any time, mere inconvenience and additional cost of operation being insufficient to sustain allegation of discrimination or arbitrary hindrance and prevention from engaging in a lawful business (Detroit Ordinance No 348-F).

12. CONSTITUTIONAL LAW—COURTS—MUNICIPAL CORPORATIONS—EXPRESSWAYS—PUBLIC SAFETY.

Record in suit by association of tow truck owners to have declared invalid home-rule city ordinance prohibiting the towing of disabled vehicles on expressways within the city during hours from 6 to 9 a.m. and from 3 to 7 p.m. except towing vehicles disabled on the expressway to nearest exit ramp *held*, not to justify Supreme Court in substituting its judgment for that of the city as to necessity for such traffic regulation for the safety and convenience of the general public (Detroit Ordinance No 348-F).

13. MUNICIPAL CORPORATIONS—ORDINANCES—CONSTRUCTION.

An ordinance that is subject to differing interpretations will be so construed as to result in the ordinance being held constitutional, where that is a permissible interpretation.

14. SAME — ORDINANCES — EXPRESSWAYS — TOWING DISABLED VEHICLES.

Home-rule city ordinance prohibiting the towing of disabled vehicles on expressways within the city during hours from 6 to 9 a.m. and from 3 to 7 p.m., except towing vehicles disabled on the expressway to nearest exit ramp is construed as to permit towing of disabled vehicles entering the expressway from end-connecting highways at city limits to nearest exit

ramp without being in violation of the ordinance (Detroit Ordinance No 348-F).

15. COSTS—PUBLIC QUESTION—HOME-RULE CITY ORDINANCE—TOW-ING DISABLED VEHICLES ON EXPRESSWAYS DURING RUSH HOURS.
No costs are allowed in suit to declare invalid home-rule city ordinance which prohibited towing of disabled vehicles on expressways during period of rush hour traffic, a public question being involved (Const 1908, art 8, § 28; CL 1948, § 475.1 *et seq.*, as amended; Detroit Ordinance No 348-F).

Appeal from Wayne; McCree, Jr. (Wade H.), J. Submitted March 8, 1963. (Calendar No. 90, Docket No. 49,547.) Decided July 17, 1963. Rehearing denied September 4, 1963.

Bill by Michigan Towing Association, Inc., a non-profit corporation, its members, and Walter J. Kraft, Jr., doing business as Kraft Towing Service, against the City of Detroit, a home-rule city, its mayor and police department, to declare void, and enjoin enforcement of, an ordinance prohibiting the towing of vehicles on an expressway during certain hours of congested traffic. Decree for plaintiffs. Defendants appeal. Reversed and bill dismissed.

*William B. Elmer* (*Mihelich, Elmer & Dank,* of counsel), for plaintiffs.

*Robert Reese,* Corporation Counsel, and *Robert D. McClear,* Assistant Corporation Counsel, for defendants.

KELLY, J. Plaintiffs filed a bill of complaint against the city of Detroit, its mayor and police department, on June 9, 1960, alleging that on November 25, 1958, the common council adopted an ordinance providing:

"No disabled motor vehicle shall be towed on any expressway between the hours of 6 a.m. and 9 a.m.

or between the hours of 3 p.m. and 7 p.m., except that any vehicle disabled on an expressway during such hours may be towed to the nearest exit ramp and thence to the surface streets." (Ordinance No 348-F.)

Plaintiffs further alleged that defendants "have attempted to enforce and threaten to attempt to enforce said ordinance"; "that said ordinance unjustly and arbitrarily discriminates against plaintiffs and other persons and corporations providing towing services for disabled vehicles" and "that said ordinance unjustly, arbitrarily and purposelessly hinders and prevents plaintiffs from engaging in a lawful and useful business"; and requested the court to restrain and enjoin defendants from enforcing said ordinance.

Following trial, the Wayne county circuit judge rendered an opinion finding that:

"The evidence is undisputed and I find that prohibition of use of the expressways between the hours of 6 a.m. and 9 a.m. and between the hours of 3 p.m. and 7 p.m., a total of 7 hours, imposes a substantial burden upon plaintiffs by materially increasing the cost of their operation and by substantially increasing the length of time necessary for them to traverse the city by using streets other than the limited access expressways. * * *

"The ordinance is therefore invalid as being outside the power of the city to enact. It is also invalid because on the record as made it bears no reasonable relationship to traffic safety or to promoting the free flow of traffic within the city. An injunction may issue as prayed."

Plaintiff's witnesses are leaders in the towing business in the Detroit area, rendering service for individuals, insurance companies, and commercial accounts and 5 of them are Michigan Towing Association members. They emphasized that their equip-

ment was of the best, making it possible for them to stop without swerving and with the same dispatch as a passenger car; that they had not been involved in expressway accidents, and that they had received certificates from the Michigan public service commission.

Plaintiffs' witnesses drew a sharp line of distinction between their experience and their equipment and ability to tow safely and that of other operators among the 500 who are engaged in towing in the metropolitan area.

Mr. Fobar, president of Michigan Towing Association, testified:

"*Q.* * * * Isn't this what you asked the council to do, to let the ordinance be effective against every tow truck except the 5 people in the city of Detroit that belonged to your association?

"*A.* No, I wouldn't say it that way, sir. I would say it this way, that if the city of Detroit, and I can appreciate their thoughts along the use of the expressways by some of these towing vehicles, especially like what is used by junk yards, they are nothing but a hazard on the street regardless of whether they use the expressways or not to my way of thinking, I wouldn't even own a piece of equipment like that, that I can appreciate the city wanting to keep them off because they are definitely a hazard, but we feel that we shouldn't be penalized for that sort of thing, in suggesting that the ordinance, as far as we are concerned would be okay if we were permitted to use it, just the certificated carriers, not only in Detroit, but in the State you have to come through the city of Detroit, they also have the—should have the right to operate. They already have the right from the State which they shouldn't be restricted."

Walter J. Kraft, Jr., testified that he had been in the towing business since 1945, and during that

period has transported, by towing, over 65,000 vehicles. He further testified:

"*Q.* In your use of the expressway, either empty or with a vehicle, a disabled vehicle, have you seen other wreckers towing vehicles?
"*A.* Yes, I have.
"*Q.* In your opinion, are they a hazard to traffic?
"*A.* They are.
"*Q.* In your opinion, is the ordinance as to them a good ordinance?
"*A.* For the people that don't know how to tow a car safely, through ignorance, I would say the ordinance is wonderful."

Plaintiffs' witnesses admitted that the ordinance did not prevent them from operating their towing businesses, but stated that it created an inconvenience. The president of the association, Mr. Fobar, said:

"Yes, it does, it takes longer. For instance, if we are crossing town there can be a variation there from anywheres from a half hour to an hour; and, naturally, that makes quite a bit more cost to me, to my driver, by my drivers, and so forth, on top— and besides that, it eliminates the being able to take care of that many more calls because of the time involved in a day's period, without going into overtime and so forth. * * *
"It (the ordinance) is an inconvenience. I mean, it takes a lot longer. * * *
"*Q.* Well, then, I understand your principal complaint is that it is inconvenient because it takes more time?
"*A.* More time; naturally, it is more cost."

Defendants established the very important part the 23 miles of State trunk-line expressways within the city of Detroit played in the vast Michigan expressway system by proving that:

1. At the time the suit was heard there were 23.3 miles of expressway in the city of Detroit with an average of 476,123 vehicles daily load, and with an annual 806 million vehicle miles;

2. The designed capacity for these expressways was 1,500 vehicles per lane per hour, but during the 6 a.m. to 9 a.m. period and the 3 p.m. to 7 p.m. period, at times, traffic density increased to 2,144 vehicles per lane per hour;

3. During 1960 there were 2,793 expressway accidents, 1,390 of which occurred during 6 a.m. to 9 a.m. and 3 p.m. to 7 p.m. in contrast to the 1,403 occurring during the other 17 hours of the day;

4. 78% of the expressway accidents were rear-end collisions, in contrast to surface streets where rear-end collisions accounted for only 45% of the total accidents.

Mr. LeRoy, traffic control engineer in charge of the control division, which division superintends the operation and regulation of traffic, testified that he recommended the adoption of the ordinance because of the "very high density flow" during rush hours, when the moving of disabled vehicles, "particularly those visibly disabled," on the expressways created "gawking or rubbernecking on the part of other vehicles or other drivers * * * tended to slow up, resulting in congestion, rear-end accidents and things of that sort"; that he recommended a 24-hour prohibition be adopted at first, but, after conference with the Michigan Towing Association, it was changed to the present 7-hour restriction; that the restriction was "felt necessary under those conditions where the utmost attention to driving was required."

Mr. Polkinghorn, third deputy commissioner and director of traffic, testified:

"One of the big problems in police control, one of the big problems that we have is supervising the activity of drivers on the expressway, is to eliminate any type of distraction that might present itself there.  *  *  *

"Our traffic has increased on the expressway about 30% so today we are practically 90% overloaded, I believe, as far as the volume is concerned.

"Then this, then, in the interest of public safety, part of the responsibility of my position with the city of Detroit, is to try to eliminate those things and those acts or those types of distracting activity in order to ensure the safer, expedient transportation.

"So, I say that this, at 25 to 30 miles an hour, and this at 50 to 55 miles an hour, or maybe even 40 miles an hour in rush hour, because we don't go as fast during rush hour because of the increased volumes, it is the opinion of the police department that the elimination of any distracting situation is part of our job and this is what we try to do in supporting the petition of the streets and traffic, and I think we were a joint petition in asking that the tow trucks not be allowed to drive through 24 hours a day.

"I stood at the common council, I requested a 24-hour prohibition of trucks going all the way through the city of Detroit, that is, starting from the westerly limits and going to the easterly limits, or any part thereof.

"Now, during that council session, represented, I believe, by you, sir, the towing industry representatives said that they would like to at least be able to haul at night and during the base period of the day.  We made this concession over my objection. I still think they should be—and it is my opinion— they should be prohibited 24 hours a day, and I think that being prohibited from operation of this type during rush hours is a fair proposition, in our opinion."

Mr. Weimer, of the Detroit police department, testified that he is in charge of 34 patrolmen who patrol the expressways; that he also travels and patrols the expressways, and said:

"*Q.* And have you seen accidents occur on the highways?

"*A.* I have. * * *

"*Q.* What did you see the people, the drivers of vehicles in the other lane, doing?

"*A.* Look at the damaged vehicle that was on the shoulder and the police car or tow vehicle.

"*Q.* Then what happened?

"*A.* Several times it causes slow downs which resulted in several rear-end accidents in the opposite traffic.

"*Q.* In the opposite lanes?

"*A.* That's right."

Appellants state:

"In this State, the legislature by PA 1933, No 254, as amended (CL 1948 and CLS 1956, § 475.1, *et seq.,* as amended [Stat Ann and Stat Ann 1961 Cum Supp § 22.531 *et seq.*]) has conferred upon the Michigan public service commission the power and authority to 'restrict the use of highways by motor vehicles operated by motor carriers to those required by the convenience of the general public.'[1] The trial court came to the conclusion that by this act the State has pre-empted the field as to the use of highways by common carriers. In coming to this conclusion, the trial court drew an analogy between the case at bar and *Allen* v. *State Highway Commissioner,* 338 Mich 407. The *Allen Case* declared the right of the highway commissioner to prohibit parking on a State trunk-line highway. It is our position that the trial court erred in coming to this conclusion and entirely overlooked the decisions of the Court which specifically hold that a common

---

[1] See CL 1948, § 475.2, as amended by PA 1957, No 173 (Stat Ann 1961 Cum Supp § 22.532).—REPORTER.

carrier who holds a certificate of necessity from the public service commission is, nevertheless, subject to ordinances enacted by the municipalities in the exercise of their right of reasonable control of their streets."

We agree with appellants' statement and disagree with the trial court's statement that, "The ordinance is * * * invalid as being outside the power of the city to enact."

The unusual type of case presented in *Allen* v. *State Highway Commissioner*, 338 Mich 407, is stated at the outset of the opinion as follows (p 410):

"This suit involves a difference between the State authorities and the city government of East Lansing cooperating with owners of lands abutting on US-16, over the control of the trunk-line road through East Lansing, so far as concerns parking of vehicles along the north half of US 16 in East Lansing."

No such dispute arises in this present appeal. The State has not intervened nor made known any objection to the ordinance in question.

In the *Allen Case*, after a joint investigation of US-16 in the city of East Lansing, as provided by the statute, the highway commissioner and the commissioner of the Michigan State police signed and issued a no-parking order on certain parts of the State trunk line within East Lansing. This order conflicted with a city ordinance allowing 1-hour parking in front of the places of business of plaintiffs, and plaintiffs complained because their businesses suffered by reason of the termination of the 1-hour parking privilege.

Plaintiffs' bill to enjoin the State highway commissioner resulted in a decree for plaintiffs and, in reversing, we called attention to the State's evidence to the effect that the daily traffic of 14,000 vehicles called for a 4-lane highway, but because (p 415)

"we are trying to put 14,000 vehicles every day through a very meager 2 lanes," a hazardous condition existed, and to meet the congestion the no-parking order was necessary. We held:

"The reasonable control of streets reserved to cities under the Constitution does not give them exclusive control, preventing the State from assuming any control over State trunk-line highways running through cities.

"The 'reasonableness' of a city's control of its streets is not within the final determination of the city in all cases, but may be determined in accordance with the legislature's interpretation in some instances, provided such interpretation can be approved by the court." (Syllabi 2 and 3.)

The fact that present plaintiffs were common carriers and under the control of the public service commission did not make them immune from city legislation. We so held in *Highway Motorbus Co.* v. *City of Lansing,* 238 Mich 146, where the plaintiffs sought to enjoin the enforcement of an ordinance to license and regulate the operation of interurban and suburban motor buses within the limits of the city of Lansing. We also so held in *Red Star Motor Drivers' Ass'n.* v. *City of Detroit,* 244 Mich 480, where in sustaining a Detroit ordinance regulating jitneys doing an intrastate and interstate business, we said (p 497):

"It is said that this ordinance is in conflict with PA 1923, No 209,[2] and that it deprives the Michigan public utilities commission of jurisdiction over these common carriers, but in *Red Star Motor Drivers' Ass'n* v. *Michigan Public Utilities Commission,* 235 Mich 85 (PUR 1926 E, 411), this Court, at the suit of one of these plaintiffs, held that act not applicable to plaintiff, and in *Highway Motorbus Co.* v. *City of*

[2] Provisions of this act are now in the motor carrier act, cited *supra*.—REPORTER.

*Lansing,* 238 Mich 146, it was urged that the carriers were under the control of the commission, hence immune from city legislation. We sustained the constitutional right of the city to reasonable control of its streets and said (p 148):

" 'Such reasonable control may not be taken from them by the courts, by individuals, by administrative bodies or by the legislature itself.' "

In *Lincoln Park Coach Co.* v. *City of Detroit,* 295 Mich 189, we upheld a Detroit common council resolution fixing routes upon which plaintiff, an intercity bus company, could operate.

Appellants conclude their brief with the following:

"The defendants urge this Court to find that this ordinance is a valid exercise of the reasonable control of streets vested in the city by the Constitution and that this ordinance does not conflict with any State statute or that if it does conflict with the provisions of section 726[3] of the Michigan vehicle code, those parts of this section which would take all control of streets from the city are unconstitutional and void. We urge the Court to find that this is a regulation and not a prohibition and we urge the Court to find that these common carriers have no right in the streets or highways, but have only a privilege which may be prohibited or regulated.

"In view of the fact that there are at present 2 expressways within the city of Detroit and a third (Walter P. Chrysler) under construction and several other expressways in the planning stage, it is of vital importance that the city of Detroit be told the extent of their authority and power to regulate traffic on these expressways for the safety and convenience of the general public. The tremendous number of vehicles traveling at high rates of speed over expressways creates a peculiar and distinct traffic hazard within the city of Detroit. It is only to minimize the hazard and dangers to the traveling

---

[3] CLS 1956, § 257.726 (Stat Ann 1960 Rev § 9.7426).—Reporter.

public that this ordinance was adopted. The city of Detroit is proud of its traffic safety record and has and intends to do, within its powers, all things necessary for the protection of human life and property."

Appellees join with appellants' request and state:

"In closing we respectfully join with the request of appellant city of Detroit as stated in the conclusion of its brief that because of the tremendous growth in the construction of expressways that it is of vital importance that the city of Detroit as well as the users of such expressways be told the extent of the authority of the city to regulate traffic on these expressways. We submit that in the interest of safety and in the interest of uniformity of traffic regulations that the Court will find, as did the trial court, that the ordinance in question is invalid."

The Constitution of 1908, art 8, § 28, establishes: "The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and township," and, also provides that: "No person, partnership, association or corporation * * * shall * * * transact a local business therein without first obtaining a franchise therefor from such city, village or township."

We have recognized the distinction between use of streets by public and common carriers and in *Melconian* v. *City of Grand Rapids*, 218 Mich 397, we held:

"The streets of a city belong to the public, and for ordinary use and general transportation and traffic they are free and common to all, and any control sought to be exercised over them by the city must be such as will not defeat or seriously interfere with their enjoyment, but common carriers have no right

to such use for private gain without the consent of the city.

"The distinction between the use of streets by the public in the usual way for pleasure or business and as a place or instrumentality for business for private gain is fundamental, and while, as to the former, the power to regulate must be sparingly exercised and only when necessary in the public interest, as to the latter the right to use may be given or withheld." (Syllabi 1 and 2.)

In *City of Dearborn v. Sugden & Sivier, Inc.,* 343 Mich 257, we held:

"The legislature may not deprive a municipality of the right to reasonable control over its streets, *even State trunk lines within its limits,* and, to the extent that a statute does so, it is invalid. (Emphasis supplied.)

"City authorities may control, within reason, the use of their streets for any purposes whatsoever not inconsistent with the State law." (Syllabi 1 and 2.)

This Court has recognized, as far back as 1915 (*People v. McGraw,* 184 Mich 233, 238) that "the congested condition of traffic on many of the streets of the city of Detroit is a matter of common knowledge, and these conditions make it absolutely necessary, for the protection of pedestrians and the drivers of vehicles, to enact rules and regulations peculiarly adapted to the conditions there found, and to enact ordinances to diminish the danger, and *the words 'reasonable control' of section 28 give the power to meet such conditions."* (Emphasis supplied.)

The present ordinance was recommended by the city officials chargeable with the duty "to diminish the danger" they concluded was caused by "gawking" and the distraction caused by the towing of disabled motor vehicles on the expressways. The ordinance

was passed by the common council after holding hearings, which plaintiffs attended.

No one challenges the ability or integrity of these officials. No one imputes to the mayor, the Detroit police department, or the common council, any improper motive or any other purpose than to reduce accidents upon the expressways.

We have said in the past (*Allen* v. *State Highway Commissioner, supra*) and we repeat in this opinion, that one claiming an ordinance is arbitrary, unreasonable, or discriminatory has the burden of so showing, and, also, that this Court will not ordinarily substitute its judgment for that of the city as to the control of the streets.

Plaintiffs have failed to meet the burden of proof. Plaintiffs can drive their tow trucks over the expressways 24 hours a day. All of the city streets, with the exception of the expressways, are available to plaintiffs during the "7 rush hours" when disabled cars cannot be towed on the expressways. Plaintiffs' proof that the ordinance caused "inconvenience" and additional cost of operation does not sustain their declaration that defendants discriminated against them and that the "ordinance unjustly, arbitrarily, and purposelessly hinders and prevents plaintiffs from engaging in a lawful and useful business."

After due study and survey defendants determined the ordinance was necessary as a traffic regulation for the safety and convenience of the general public. There is nothing in the record presented to this Court that would justify substituting our judgment for that of the city in this respect.

Plaintiffs' contention that a truck towing a disabled vehicle entering the city of Detroit from the west on the Edsel Ford expressway during the proscribed hours would be in violation of the ordinance, is without merit. A reasonable interpreta-

tion of the ordinance is that a person entering the city of Detroit on an expressway while towing a disabled vehicle be permitted to proceed to the first exit.

The exception provided in the ordinance reads:

"Except that any vehicle disabled on an expressway during such hours may be towed to the nearest exit ramp and thence to the surface streets." ··

This Court has held that where a legislative enactment is subject to differing interpretations, that which would result in the act being held constitutional should be followed. See *State Bar of Michigan* v. *City of Lansing*, 361 Mich 185.

We agree with appellants that a reasonable interpretation of this ordinance would permit vehicles entering the city of Detroit on the Edsel Ford expressway to proceed to the first exit (which presently is the Livernois exit) without being in violation of the ordinance.

The decree heretofore entered is set aside and plaintiffs' bill of complaint is dismissed. No costs, a public question being involved.

CARR, C. J., and DETHMERS, BLACK, SOURIS, SMITH, and O'HARA, JJ., concurred with KELLY, J.

KAVANAGH, J., concurred in result.