PEOPLE *v.* OTIS ADAMS

1. KIDNAPPING—STATUTES—JUDICIAL CONSTRUCTION.

This state's kidnapping statute is so all-encompassing that unless its operative effect is confined by objective standards it would be void for overbreadth (MCLA § 750.349).

2. KIDNAPPING—ASPORTATION—SECRET CONFINEMENT.

The kidnapping statute covers two basic patterns:  (a) where the victim is seized and removed to another place and (b) where the victim is confined in the place where he is found; in the first, an asportation or movement of the victim is an essential element; in the second, movement is not essential, but secrecy of confinement is required (MCLA § 750.349).

3. KIDNAPPING—NON-SECRET CONFINEMENT—MOVEMENT.

A confinement, other than a secret confinement, without a movement of the victim is not a kidnapping; every movement of the victim is not a kidnapping (MCLA § 750.349).

4. KIDNAPPING—ASPORTATION.

An asportation of the victim, where there has not been a secret confinement of the victim, is necessary to support a kidnapping conviction (MCLA § 750.349).

5. STATUTES—CONSTRUCTION—PURPOSE—LITERAL INTERPRETATION.

A statute's spirit and purpose should prevail over its strict letter.

REFERENCES FOR POINTS IN HEADNOTES

[1] 50 Am Jur, Statutes § 472.
[1, 8, 9] 16 Am Jur 2d, Constitutional Law § 552.
[2–4, 10–13, 16–18] 1 Am Jur 2d, Abduction and Kidnapping § 11 *et seq.*
[2–4] Secrecy, or intent of secrecy, as a necessary element of kidnapping. 68 ALR 719.
[5] 50 Am Jur, Statutes § 301 *et seq.*
[6] 50 Am Jur, Statutes §§ 223, 224, 235 *et seq.*
[7, 15] 50 Am Jur, Statutes § 407 *et seq.*
[14] 6 Am Jur 2d, Assault and Battery § 1 *et seq.*

6. STATUTES—CONSTRUCTION—GENERAL   TERMS—AVOIDING   ABSURD
CONSEQUENCES.

Statutes should be construed in light of the presumption that the
Legislature intended exceptions to literal statutory language
which otherwise would lead to absurd consequences; therefore,
general terms in a statute should be so limited in their ap-
plication as not to lead to injustice, oppression, or an absurd
consequence.

7. CRIMINAL   LAW—STATUTES—CONSTRUCTION—CRIME   BY   IMPLICA-
TION.

Criminal statutes may not be construed so as to derive out-
lawry from some ambiguous implication in the statutory lan-
guage.

8. CRIMINAL LAW—STATUTES—CONSTITUTIONAL LAW—VAGUENESS.

A criminal statute may be so vague as to violate due process if
(a) its language is so imprecise that it fails to give fair
notice of the conduct proscribed, or (b) its language is cer-
tain but its breadth could impinge upon First Amendment free-
doms, or (c) its language is so vague and standardless that
it leaves judges and jurors to decide what is or is not
prohibited by the statute in each particular case.

9. CRIMINAL LAW—STATUTES—CONSTITUTIONAL LAW—VAGUENESS—
PROSECUTOR'S DISCRETION.

A criminal statute whose language is so vague as to give no
objective standards to be applied by the prosecutor when
charging a defendant is constitutionally invalid because of
the potential of prosecutorial abuse.

10. KIDNAPPING—ASPORTATION—PURPOSE—RISK OF HARM.

The kidnapping statute, when dealing with the victim's asporta-
tion, seeks not to prevent just the movement of the victim, but
his removal from one place to another which increases the risk
of harm to him (MCLA § 750.349).

11. KIDNAPPING — ASPORTATION — INDEPENDENT SIGNIFICANCE —
REMOVAL FROM ENVIRONMENT.

The mere movement of a victim does not constitute an asporta-
tion under the kidnapping statute unless the asportation has
significance independent of the assault; unless the victim is
removed from the environment where he was found, the con-
sequences of the movement to the victim are not independently
significant from the assault (MCLA § 750.349).

12. KIDNAPPING — ASPORTATION — REMOVAL FROM ENVIRONMENT — "ENVIRONMENT".

The "environment" from which a kidnapping victim must be removed to have an asportation independently significant of the commission of an assault is the totality of the surroundings, animate and inanimate (MCLA § 750.349).

13. KIDNAPPING—CONFINEMENT AND ASPORTATION—WITHIN PRISON.

The crime of kidnapping was not committed where inmates seized, confined, and forcibly moved a prison official from one location to another within the prison where the confinement was not secret, the location of the parties was at all times known to other prison officials and their location was cordoned off and surrounded with an overwhelming armed force and where the asportation of the official had no significance independent of the felonious assault upon him, because the official was not removed from the prison environment from which he was found, he was not subjected to an increased risk of harm but was moved from a crowded cell block to the prison's hospital to provide a cooling-off period, and the inmates never intended to use the official as a hostage to effect an escape, but seized him as an aid in having their grievances heard (MCLA § 750.349).

14. ASSAULT AND BATTERY—ASSAULT—PRISON GUARD.

An assault by a prisoner on a prison guard or official is treated no differently than an assault outside prison walls; this state has no statute dealing especially with the situation of an assault on a prison guard.

15. CRIMINAL LAW—STATUTES — CONSTRUCTION — JUDICIAL EXPANSION.

A criminal statute, in contrast with the common law, may not be expanded by the courts to meet new problems beyond the contemplation of the Legislature when the statute was enacted.

DISSENT BY GILLIS, P. J.

16. KIDNAPPING—ASPORTATION—INDEPENDENT SIGNIFICANCE.

*The rule that the crime of kidnapping is committed by an asportation or confinement in the commission of another crime only where the restraint and forcible movement is not incidental to or an integral part of that other crime is designed only to prevent gross distortion of lesser crimes into a more serious crime by excess of prosecutorial zeal; the rule was not designed to merge "true" kidnappings into other crimes merely*

*because the kidnappings were used to accomplish ultimate crimes of lesser or equal or greater gravity (MCLA § 750.349).*

17. KIDNAPPING—INVOLUNTARY SEIZURE.
*The gist of a kidnapping offense is the involuntariness of the seizure (MCLA § 750.349).*

18. KIDNAPPING—ELEMENT—SEIZURE, CONFINEMENT, AND MOVEMENT.
—WITHIN PRISON.
*Whether a kidnapping occurred was a question of fact where the defendant, an inmate, forcibly seized, confined, and moved a prison official from one location to another within the prison and the official was exposed to a serious risk of harm (MCLA § 750.349).*

Appeal from Jackson, Charles J. Falahee, J. Submitted Division 2 April 11, 1969, at Detroit. (Docket No. 3940.) Decided June 24, 1971. Leave to appeal granted, 385 Mich 784.

Otis L. Adams was convicted of kidnapping. Defendant appeals. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Bruce A. Barton,* Prosecuting Attorney, and *Paul R. Adams,* Assistant Prosecuting Attorney, for the people.

*James S. Treciak,* for defendant on appeal.

Before: J. H. GILLIS, P. J., and BRONSON and LEVIN, JJ.

LEVIN, J. The defendant, Otis L. Adams, appeals his conviction of kidnapping.

Kidnapping is now a statutory, not a common-law crime. The relevant portion of our statute makes it unlawful to "wilfully, maliciously and without lawful authority * * * forcibly or secretly confine

or imprison any other person within this state against his will".[1] But every forcible confinement is not the capital offense of kidnapping.

Our kidnapping statute, like most, is so all-encompassing in its literal breadth that unless its operative effect is confined by objective standards it would be void for overbreadth.[2]

Where a kidnapping statute does not in terms require a "carrying away" of the victim, an asportation requirement or, as a substitute, the element of secrecy, has been judicially read into and made a part of the definition of the crime.[3]

There are two basic kidnapping patterns. In one, the victim is seized and removed to another place;

---

[1] "Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years." MCLA § 750.349 (Stat Ann 1954 Rev § 28.581).

It will be observed that there are two seemingly separable parts of this statutory provision. Under the first part, there is proscribed forcible or secret confinement of a person within this state or forcibly sending him out of the state. The second part concerns a forcible seizure or confinement, inveigling or kidnapping *with intent* to extort money or other valuable thing or to secretly confine or imprison the victim or to hold him for service against his will.

The information in this case speaks only in the language of the first part. (See fn 4, *infra.*)

The second part of the statutory definition may be viewed as a qualification of the first part and, if so, then it would be necessary to consider in every case where kidnapping is charged whether a seizure or confinement was with the proscribed specific intent. Or the second part may be viewed as independent of the first part. The form of the information filed in this case and our disposition of this appeal makes it unnecessary for us to consider these further questions.

[2] See *United States* v. *Robel* (1967), 389 US 258, 266 (88 S Ct 419, 425; 19 L Ed 2d 508, 515); *People* v. *Katz* (1967), 21 NY2d 132, 135 (286 NYS2d 839, 841; 233 NE2d 845, 847).

[3] Perkins on Criminal Law (2d ed), p 177; *State* v. *Reid* (1969) 5 NC App 424 (168 SE2d 511).

in the other, the victim is confined in the place where he is found. In the first, an asportation or movement of the victim is an essential element; in the second, movement is not an element, but secrecy of the confinement is required.

In this case the people do not charge that the victim was secretly confined. The information charged the defendant Otis Adams with "forcibly confining and imprisoning" his victim[4]—the word "secretly" in the statutory phrase "forcibly or secretly confine" was omitted when the charge was drawn.

To save the Michigan kidnapping statute, insofar as it applies to nonsecret confinements, from a declaration of unconstitutionality because of overbreadth we read it as requiring an asportation. A confinement (other than a secret confinement) without a movement of the victim is not kidnapping. And, for reasons which we will spell out, every movement of the victim of an assaultive crime incidental to the commission of that crime is not kidnapping; the asportation must have a significance independent of the assault in order to manifest the capital and separate offense of kidnapping.

In this case the victim, a prison official, was seized in Jackson State Prison by Adams and other inmates and moved from one part of the prison to another. The seizure and movement occurred in the presence of prison guards; the exact location of both the victim and of the defendant Adams was at all times known to prison guards who had the place cordoned off and surrounded by overwhelming armed force. It is not claimed that Adams ever

---

4 Adams was tried under an information which charged him with: "wilfully, maliciously, and without lawful authority forcibly confining and imprisoning another person, to-wit: Inspector Joseph Dembosky, within this state and against his will."

intended to remove his victim from the prison or that he intended to attempt to effect an escape. This is not the usual hostage pattern, nor is it the usual kidnapping pattern.

## I.

### *Facts*

On the morning of October 18, 1965, Adams consumed substantial quantities of alcohol and barbiturates in the company of several other inmates of Jackson Prison. Their conversation turned to the grievances—real or imagined—which they felt against the prison administration.

Shortly after 11 a.m., Adams and inmate Edward Whitehead went to the main dining hall of the prison where lunch was being served. Adams cut into the serving line ahead of other inmates and was told by a guard to go to the end of the line. Adams directed some verbal abuse at the guard, then proceeded with Whitehead to the prison's 4-block, a cell block in the northwest portion of the prison. Adams' conduct aroused the attention of two unarmed prison guards who followed him to 4-block.

Because this was the lunch hour, several hundred prisoners were milling about 4-block. The presence of Adams and Whitehead, plus a third inmate, Alvin Shaw, all of whom were highly agitated, as well as the two guards and the hundreds of milling prisoners, led to a disturbance of uncertain proportions.

At this time Inspector Joseph Dembosky, the highest ranking uniformed prison officer, was notified of the disturbance in 4-block. He immediately proceeded to the area and thrust himself into the center of the milling crowd.

Before Inspector Dembosky could take any action, he was seized from behind by inmate White-

head, who held a knife to his throat. Adams also produced a knife which he used to wave back the prisoners pressing in on Inspector Dembosky and Whitehead. At the trial Inspector Dembosky testified that at this point he said, "Can't we talk about this?" Another witness testified that Dembosky said, "Can't we go somewhere and talk about this?" Adams, Whitehead, and Shaw, all of whom had knives, then accompanied Dembosky at knifepoint out of 4-block into the prison yard.

There were approximately one thousand inmates in the yard as Dembosky, Whitehead, Shaw, and Adams left 4-block. Inspector Dembosky testified that he felt that there was danger of a riot if the party remained in the yard. He suggested that they go to the prison gymnasium to talk things over. Instead, he was forced to accompany Whitehead, Shaw, and Adams to the prison hospital, which was roughly 1500 feet from the entrance to 4-block. During their journey to the hospital, the armed inmates repeatedly shouted warnings to the heavily-armed tower guards that Inspector Dembosky would be killed if they were fired upon.

Shortly before reaching the hospital building, the group was joined by another inmate, Milton Thomas, who was also armed. Together, immediately after entering the hospital, they seized two guards, a prison doctor, and an inmate elevator operator named Hubbard. Shaw, Whitehead, Thomas, and Adams, together with Inspector Dembosky and the other victims, then proceeded to the doctor's lounge on the fifth floor of the hospital.

Adams and his cohorts erected barricades around the lounge. Over an intercom, they repeatedly demanded to see various prison officials, as well as the warden, to air their grievances. They also demand-

ed to see a newspaper reporter. There were repeated warnings that Inspector Dembosky would be killed if they were fired upon.

During the hours that followed, the armed inmates displayed contradictory behavior toward their captives. The physician was released when Adams ascertained that he had a heart condition. Thomas told the warden to notify the pregnant wife of one of the captive guards that he would not be harmed. Contrastingly, inmate Hubbard was severely beaten by Adams, then released as an example of Adams' serious intentions.

A number of prison officials visited the fifth floor landing to discuss grievances. A newspaper reporter summoned to the scene was occupied for almost three hours in recording these grievances. Adams repeatedly expressed his fear of being shot by guards when he left the fifth floor.

After about 5-1/2 hours, Shaw, Whitehead, Thomas, and Adams were persuaded to abandon their barricaded position. Upon being given assurances that they would not be shot, they released their captives unharmed. They then proceeded to the deputy warden's office, where they surrendered their weapons.

The reprehensible nature of Adams' action does not alter our duty to determine whether the evidence against him is sufficient to support his conviction for kidnapping Inspector Dembosky.[5]

[5] The failure of Adams' counsel to move for a directed verdict, to make a motion for a new trial, or to assign insufficiency of evidence as error on appeal does not relieve us of our obligation to notice plain error. See *People* v. *Smith* (1932), 260 Mich 486, where, despite identical procedural deficiencies, the Michigan Supreme Court observed (p 489):

"Conviction by a jury without evidence commands no procedural support, and when the error is fundamental, manifest and noticed, such a conviction cannot be permitted to stand."

We invited the parties to file additional briefs on the question we decide and they did so.

## II.

### The statute and its overbreadth

"The sense of any statute is to be collected from its object and the nature of the subject matter. Particular phrases must be read in the light of the contextual setting. The import of such language is controlled accordingly. The literal sense of terminology cannot prevail over the reason and spirit of the expression as a whole." *Dodd* v. *Copeland* (1968), 99 NJ Super 481, 486 (240 A2d 444, 446).

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." *People* v. *Daniels* (1969), 71 Cal 2d 1119, 1130 (80 Cal Rptr 897, 903; 459 P2d 225, 231), quoting *United States* v. *Kirby* (1868), 74 US (7 Wall) 482, 486 (19 L Ed 278, 280).

A statute's "spirit and purpose should prevail over its strict letter". *Webster* v. *Rotary Electric Steel Company* (1948), 321 Mich 526, 531.

"When choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." *United States* v. *Universal C.I.T. Credit Corporation* (1952), 344 US 218, 221, 222 (73 S Ct 227, 229; 97 L Ed 260, 264); followed in *Toussie* v. *United States* (1970), 397 US 112, 122 (90 S Ct 858, 864; 25 L Ed 2d 156, 165).

Our kidnapping statute has not been construed by our Supreme Court except in the context of child

custody disputes. In those cases the Court rejected a rigid, formalistic reading and set aside the convictions.[6]

What is immediately obvious about the language of our kidnapping statute is the extraordinary range of conduct it might proscribe.

In the phrase "forcible confinement or imprisonment," the word "imprisonment" is clearly a narrower term than "confinement"; every "imprisonment" would be a "confinement". The word "forcible" adds little, if anything, to the word "confine". "Confine," in the sense in which it is used in this statute, clearly speaks of an involuntary restraint of the liberty of the individual, which, of necessity, is brought about by the use of some force. Similarly, as to the words "against his will". If the confinement was voluntary, it would mean that the victim was confined although he was free to leave—an obvious contradiction of terms.

Since "confine" in this context strongly implies force of some kind, the offense is complete when the actor "wilfully, maliciously and without lawful authority" confines the victim. And, since in the ordinary case there is likely to be no question of lawful authority (and besides, lawful authority negatives "malice"), and since the wilfulness required by law does not enlarge the requirement of malice,[7] *violation of the terms of the statute occurs whenever the actor "maliciously confines" any other person.*

---

[6] See *People* v. *Nelson* (1948), 322 Mich 262 (agent of father who took physical possession of a four-year-old child and immediately turned him over to his father was not guilty of kidnapping); *People* v. *Congdon* (1889), 77 Mich 351 (adopted child left her adoptive parents to live with her natural mother; the conviction of the mother and others for kidnapping was reversed).

[7] Although malice in common speech implies a somewhat more evil state of mind than wilfulness, the terms are virtually synonymous in the law. See *Potomac Insurance Company* v. *Torres* (1965), 75 NM 129 (401 P2d 308); *People* v. *Morrin* (1971), 31 Mich App 301.

"Malice, in its common acceptation, means ill will toward some person.  In its legal sense, it applies to a wrongful act committed intentionally against that person, without legal justification or excuse."  *Bonkowski* v. *Arlan's Department Store* (1970), 383 Mich 90, 99.

Although this was said in a civil case, it is the correct definition of the legal meaning of the term "malice" in criminal as well as civil cases.[8]

Accordingly, freed of its tautology, the kidnapping statute, simply put, makes it kidnapping to *intentionally confine another person without legal justification or excuse.*

It will be observed that the statute makes no reference to the duration or circumstances of the confinement.  Literally construed, the statute leads to absurd results.  The trespasser who momentarily locks a caretaker in his cottage is placed on the same footing as the professional criminal who invades a home, seizes the occupants at gunpoint, transports them to a secret hideout, and holds them for ransom.  The robber who orders his victim to stand motionless while his wallet is removed is guilty of the same crime as the robber who forces his victim to drive for miles to a deserted location, where he is terrorized and abandoned.  A group of college students who invade a dean's office, wrongfully confining its occupants, commit the same offense as a gang of rapists who seize a woman and remove her from her family to a place of isolation.

Shopkeepers who wrongfully detain suspected shoplifters, cabdrivers who purposely deliver passengers to the wrong destinations, tavernkeepers who bar exists until bar bills have been paid, all may be subject to civil damage actions, but a sensible

---

[8] See *People* v. *Morrin*, fn 7, *supra.*

penology rebels at the classification of such acts as capital offenses.

As emphatically as these examples offend a rational penal code, they scarcely embrace all the varieties of technically culpable, but scarcely menacing, conduct which violates a statutory ban on "intentional confinement" of any other person.

In *Chatwin* v. *United States* (1946), 326 US 455, 463, 464 (66 S Ct 233, 237; 90 L Ed 198, 202, 203), the United States Supreme Court recognized the dangers of overly broad constructions of the Federal Kidnapping Act. The Court noted that the framers of the act had used "comprehensive language * * * to cover every possible variety of kidnapping followed by interstate transportation". Nonetheless, the Court acknowledged a duty to define the limits of the kidnapping sanction more narrowly than the language of the act would support:

"Were we to sanction a careless concept of the crime of kidnapping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity."

The refusal of the Supreme Court to authorize a "careless concept of kidnapping" reflects an appreciation of the potential for misuse inherent in an imprecisely drawn kidnapping statute. We share this concern.

The doctrine that statutes may be so vague as to violate due process embraces three major classes of legislation.[9] The first, and perhaps most common, is that species of penal statute which fails to give fair notice of the conduct proscribed.[10] A statute whose

---

[9] See, generally, Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U Pa L Rev 67 (1960); Note, Due Process Requirements of Definiteness in Statutes, 62 Harv L Rev 77 (1948).

[10] See *Lanzetta* v. *New Jersey* (1939), 306 US 451, 453 (59 S Ct 618, 619; 83 L Ed 888, 890); *Bowie* v. *City of Columbia* (1964), 378 US

language is certain, but whose breadth may impinge upon protected First Amendment freedoms, may also be "void for vagueness".[11]

We need not dwell on these issues. The statute before us intrudes upon constitutional safeguards in a far more obvious fashion. The third type of unconstitutionally vague statute is that which confers upon judges or jurors an unlimited discretion to determine who shall be punished for certain conduct.[12]

"A law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio* v. *Pennsylvania* (1965), 382 US 399, 402 (86 S Ct 518, 520; 15 L Ed 2d 447, 450).[13]

347 (84 S Ct 1697, 12 L Ed 2d 894); *People* v. *Goulding* (1936), 275 Mich 353; *People* v. *Austin* (1942), 301 Mich 456; *City of Detroit* v. *Bowden* (1967), 6 Mich App 514; *City of Dearborn Heights* v. *Bellock* (1969), 17 Mich App 163.

[11] *Baggett* v. *Bullitt* (1964), 377 US 360 (84 S Ct 1316, 12 L Ed 2d 377); *Cox* v. *Louisiana* (1965), 379 US 536 (85 S Ct 453, 13 L Ed 2d 471); Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U Pa L Rev 67 (1960).

The rationale for voiding such statutes rests upon the need to provide "breathing space" for the exercise of First Amendment rights. *Cox* v. *Louisiana, supra,* pp 551, 552.

[12] *United States* v. *Robel,* fn 2, *supra; People* v. *Katz,* fn 2, *supra; City of Detroit* v. *Sanchez* (1969), 18 Mich App 399; *Yick Wo* v. *Hopkins* (1886), 118 US 356 (6 S Ct 1064, 30 L Ed 220); *Hague* v. *CIO* (1939), 307 US 496 (59 S Ct 954, 83 L Ed 1423).

See, also, Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U Pa L Rev 67, 111–113 (1960), and Burin, The Theory of the Rule of Law and the Structure of the Constitutional State, 15 Am U L Rev 313, 314, 315 (1966):

"Rule by law * * * militates against the enactment of excessively vague general laws granting power to administrators and judges to deal arbitrarily with the citizen. The law must be 'specific in its generality.'"

[13] Similarly, see *Herndon* v. *Lowry* (1937), 301 US 242, 263, 264 (57 S Ct 732, 742; 81 L Ed 1066, 1078).

Discretion thus unbound by fixed standards becomes not discretion in the legal sense of the term, but, rather, naked and arbitrary power.[14]

It is obvious that virtually any assault, any battery, any rape, or any robbery involves some "intentional confinement" of the person of the victim.[15] To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery,[16] into a capital offense. A literal reading of the kidnapping statute would permit a prosecutor to aggravate the charges against any assailant, robber, or rapist by charging the literal violation of the kidnapping statute which must inevitably accompany each of those offenses.

In this connection, it is important to remember that under present precedent and practice a prosecutor is governed solely by his personal judgments; there are no objectifiable standards which must be applied. Plea bargaining is an established practice; a prosecutor may, therefore, threaten conviction of a capital offense with a view to extracting a guilty plea without any review of his charging decision.[17]

Such abuses may not be common in this state; yet, as the United States Supreme Court said in *Baggett* v. *Bullitt* (1964), 377 US 360, 373 (84 S Ct 1316, 1323; 12 L Ed 2d 377, 386):

---

[14] *Yick Wo* v. *Hopkins*, fn 12, *supra*.

[15] *People* v. *Levy* (1965), 15 NY2d 159 (256 NYS2d 793, 204 NE2d 842); *People* v. *Daniels* (1969), 71 Cal 2d 1119 (80 Cal Rptr 897, 459 P2d 225).

[16] MCLA § 750.81 (Stat Ann 1962 Rev § 28.276).

[17] See Miller, Prosecution: The Decision to Charge a Suspect with a Crime; *People* v. *Byrd* (1968), 12 Mich App 186; Alschuler, The Prosecutor's Role in Plea Bargaining, 36 U Chi L Rev 50 (1968); Ferguson, Formulation of Enforcement Policy: An Anatomy of the Prosecutor's Discretion Prior to Accusation, 11 Rutgers L Rev 507 (1957).

See Model Penal Code, Tentative Draft No 11, p 13: "Examples of abusive prosecution for kidnapping are common."

"Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law."

Mr. Justice Roberts warns us:

"Evil men are rarely given power; they take it over from better men to whom it has been entrusted."[18]

Just as it is obvious that the Legislature did not intend the kidnapping statute to expose virtually every other crime against the person to capital sanctions, so too it is obvious that the language of the statute provides no standards for determining who shall be punished for its violation. It is our responsibility to preserve the essence of the statute while construing it to withstand constitutional challenge.[19] Accordingly, we turn to an analysis of the substantive law of kidnapping.

### III.

*Substantive law of kidnapping*

At common law, kidnapping required an asportation of the victim out of the country. Kidnapping was a misdemeanor, and was viewed merely as an aggravated form of false imprisonment; the aggravating factor was the removal of the victim from the sovereign's protection.[20]

Kidnapping statutes in the United States have abolished the requirement that a national or a regional boundary be breached.[21]

---

[18] *Screws* v. *United States* (1945), 325 US 91, 160 (65 S Ct 1031, 1063; 89 L Ed 1495, 1534).

[19] See *Michigan Towing Association* v. *City of Detroit* (1963), 370 Mich 440, 456; *State Bar of Michigan* v. *City of Lansing* (1960), 361 Mich 185, 195.

[20] For discussions of the common-law crime of kidnapping, see Perkins on Criminal Law (2d ed), p 176; Note, A Rationale of the Law of Kidnapping, 53 Colum L Rev 540 (1953).

[21] See Note, A Rationale of the Law of Kidnapping (53 Colum

Modification of the asportation element of the common-law crime was not the only American statutory departure from the common law. Public revulsion against the wave of carefully-planned and often brutal kidnappings for ransom of the 1920's and 1930's[22] resulted in the imposition of heavy penalties,[23] including the death penalty, for kidnappers, and passage of the Federal Kidnapping Act, the so-called Lindbergh Law.[24] It was in 1931 that Michigan imposed a maximum sentence of life imprisonment for kidnapping.[25]

Another characteristic of kidnapping legislation has been its failure to distinguish between the crimes of kidnapping and false imprisonment. Michigan, along with most states, does not have a separate false imprisonment statute.

These matters aside, the principal question that has perplexed American courts in construing kidnapping legislation has been the degree of asportation required to transform an assault, robbery, or

L Rev 540 (1953); Model Penal Code Tentative Draft No 11, pp 11 et seq.

[22] See Fisher and McGuire, Kidnapping and the So-Called Lindbergh Law, 12 NYU L Q Rev 646 (1935); Finley, The Lindbergh Law, 28 Ga L J 908 (1939-1940).

[23] See Model Penal Code, Tentative Draft No 11, comment p 11, fn 1: "Kidnapping (or some category of it) is punishable by life imprisonment or death in all states except Alaska (10 years), Connecticut (50 years), Minnesota (40 years), New Hampshire (25 years), and North Dakota (20 years). Where kidnapping is divided into degrees, even simple kidnapping is punishable by life imprisonment, in some states, and the maximum in other states is commonly 10-25 years."

The offense is also punishable by the relatively low maximum sentence of 10 years in Montana; see State v. Randall (1960), 137 Mont 534 (353 P2d 1054), cited in Judge GILLIS' opinion.

Modern legislation, as an inducement to the felon to release his victim unharmed, reserves the capital offense of kidnapping for cases where the victim is not voluntarily released free of serious physical injury. See, e.g., New York Penal Law, § 135.00 et seq.; Model Penal Code, § 212 et seq.; Study Draft of a New Federal Criminal Code, § 1631.

[24] 18 USCA § 1201.

[25] PA 1931, No 328, § 349.

other crime into kidnapping. Torn between the common-law rule that a most significant asportation was required, and the obvious legislative intention to broaden the scope of the offense, the courts, virtually without exception, endorsed the idea that any asportation, however slight, was sufficient to constitute kidnapping.[26]

Representative of this formulation were the opinions of the California Supreme Court in *People* v. *Chessman* (1951), 38 Cal 2d 166, 192 (238 P2d 1001, 1017), and *People* v. *Wein* (1958), 50 Cal 2d 383, 399, 400 (326 P2d 457, 466). In *Chessman,* the defendant forced his victim to move 22 feet to his automobile, where he sexually assaulted her. The Court held that, "It is the fact, not the distance, of forcible removal which constitutes kidnapping in this state". In *Wein,* the Court applied the *Chessman* standard to uphold the kidnapping conviction of a defendant who forced his victims to move from room to room in their own homes during a series of robberies and rapes. These holdings came under sharp criticism,[27] but were accurate reflections of the state of the law[28] until quite recently.

The first significant departure from the "any asportation" requirement came in another California case, *Cotton* v. *Superior Court* (1961), 56 Cal 2d 459, 464 (15 Cal Rptr 65, 68, 364 P2d 241, 244). A labor dispute led to the invasion of a farm worker's camp by union members. Several braceros were assaulted

---

[26] *State* v. *Lowry* (1965), 263 NC 536 (139 SE2d 870); *State* v. *Kress* (1969), 105 NJ Super 514 (253 A2d 481); *Cox* v. *State* (1931), 203 Ind 544 (177 NE 898).

[27] See Model Penal Code, Tentative Draft No 11, p 14, fn 9, as to *Chessman. Wein* was termed the *reductio ad absurdum* case in Packer, The Case for Revision of the Penal Code, 13 Stan L Rev 252, 259, fn 41 (1961).

[28] See *People* v. *Florio* (1950), 301 NY 46 (92 NE2d 881, 17 ALR2d 993); *State* v. *Brown* (1957), 181 Kan 375 (312 P2d 832); *State* v *Johnson* (1961), 67 NJ Super 414 (170 A2d 830).

and dragged about the camp during the ensuing riot. The California Supreme Court ruled that the assailants could not be convicted of kidnapping, saying that "all 'asportation' in the instant case would appear to be only incidental to the assault and rioting". The Court declared that it should avoid "absurd consequences"[29] in application of the kidnapping laws; it warned that a literal reading of the California statute "could result in a rule that every assault could also be prosecuted for kidnapping". The Court ignored, it did not overrule, *Chessman* and *Wein,* but the significance of *Cotton* was not lost on the commentators.[30]

A few years after *Cotton* was decided, the New York Court of Appeals articulated a new approach to the asportation requirement. In *People* v. *Levy* (1965), 15 NY2d 159, 164 (256 NYS2d 793, 796; 204 NE2d 842, 844), the defendants accosted the victims, who had just arrived at their home in an automobile. One of the defendants took the wheel, and the victims, husband and wife, were driven about city streets for twenty minutes, covering twenty-seven blocks. During this journey the victims were robbed of money and jewelry.

The defendants were convicted by a jury of kidnapping under the New York statute, which provided that a person who "confines" another with intent to "cause him  *  *  *  to be confined" against his will is guilty of kidnapping. The Court of Appeals reversed. Central to the Court's holding was its concern that the broad statutory definition,

---

[29] That in construing statutes courts avoid constructions which lead to absurd consequences, see *Attorney General* v. *Detroit United Railway* (1920), 210 Mich 227, 254; *People* v. *Chimovitz* (1927), 237 Mich 247; *In re Wright* (1960), 360 Mich 455, 459.

[30] Note, Kidnapping and the Element of Asportation, 35 So Cal L Rev 212 (1962); Note, Kidnapping—Movement Incidental to the Commission of a Crime Held Insufficient to Support Indictment for Simple Kidnapping in California, 110 U Pa L Rev 293 (1961).

"could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes.  *  *  *  It is a common occurrence in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved into and left in another room or place.

"It is unlikely that these restraints, sometimes accompanied by asportation, which are incidents to other crimes and have long been treated as integral parts of other crimes, were intended by the Legislature in framing its broad definition of kidnapping to constitute a separate crime of kidnapping, even though kidnapping might sometimes be spelled out literally from the statutory words."

The Court overruled a contrary prior decision[31] and held that the kidnapping statute was to be limited in its application "to 'kidnapping' in the conventional sense in which that term has now come to have acquired meaning".

Left unresolved in *Levy* was the precise degree of asportation necessary to constitute "kidnapping in the conventional sense".  The opinion did, however, revive the requirement that some meaningful asportation must accompany the crime.  In a subsequent case the Court of Appeals declared that "the direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape, or assault and in which some confinement or asportation occurs as a subsidiary incident".  *People* v. *Lombardi* (1967), 20 NY2d

---

31 *People* v. *Florio*, fn 28, *supra*.  In *Florio* a girl was enticed into an automobile and driven from Manhattan to an isolated spot in Queens where she was raped.

266, 270 (282 NYS2d 519, 521; 229 NE2d 206, 208).
But, in a still more recent case, the Court held that
"the more complicated nature of the asportation"
pursued in the defendant's efforts to kill the victim,
removed the case from the *Levy-Lombardi* rule.[32]

The reasoning of the New York Court of Appeals
was not accepted by other courts. Several jurisdic-
tions expressly rejected the idea that a substantial
asportation was necessary under broadly-worded
kidnapping statutes.[33]

In 1969, by a six-to-one decision, the California
Supreme Court overruled its prior constructions in
the *Chessman-Wein* line of cases. *People* v. *Daniels*
(1969), 71 Cal 2d 1119, 1139 (80 Cal Rptr 897, 910;
459 P2d 225, 238), clearly repudiates the doctrine
that any asportation of the victim is sufficient to con-
stitute kidnapping. There the victims had been
forced to move about in their apartments during
the commission of crimes of robbery and rape. The
Court declared:

"We hold that the intent of the Legislature
* * * was to exclude from [the statute's] reach
not only 'standstill' robberies * * * but also those
in which the movements of the victim are merely in-

---

[32] *People* v. *Miles* (1969), 23 NY2d 527, 539 (297 NYS2d 913, 921, 245 NE2d 688, 694).

[33] *State* v. *Ayers* (1967), 198 Kan 467, 471 (426 P2d 21, 25); *Davis* v. *State* (1970), 204 Kan 816 (466 P2d 311); *Samuels* v. *State* (Del, 1969), 253 A2d 201; *State* v. *Morris* (1968), 281 Minn 119 (160 NW2d 715). It is interesting to note that the Kansas Court cited *Wein*, and the Minnesota Court *Chessman* and *Wein*, as authority for their rejection of *Levy*. Both *Chessman* and *Wein* have since been overruled (see *People* v. *Daniels*, fn 15, *supra*, discussed *infra* in the accompanying text.

In *Rice* v. *State* (1970), 9 Md App 552 (267 A2d 261), the de-
fendant entered the victim's apartment. She screamed. A neighbor
telephoned to inquire if she needed aid. The victim was then required
to accompany the defendant to his apartment in another building.
The Court of Special Appeals of Maryland held that the offense of
kidnapping had been committed, and declined to "predict the result
for future cases involving different facts."

See, also, *State* v. *Soders* (1970), 106 Ariz 79 (471 P2d 275).

cidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."

A few months ago the California Supreme Court elaborated on its decision in *Daniels*. See *People* v. *Timmons* (1971), 4 Cal 3d 411 (93 Cal Rptr 736, 482 P2d 648), where the Court held that the defendant's acts in entering the robbery victims' automobile and directing them to drive it some five city blocks, in order to facilitate the robbery, did not constitute kidnapping since the acts did not "substantially" increase "the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime [robbery] is normally exposed". Similarly, see *People* v. *Smith* (1971), 4 Cal 3d 426 (93 Cal Rptr 743, 482 P2d 655), where the Court held that the crime of kidnapping had not been committed where, in the course of robbing a hotel, the defendant caused the night clerk to move about the office and up to a second floor room.

Having reviewed the authorities in some detail, we approach decision.

## IV.

### *The asportation requirement and the standard by which it is applied*

We hold that, except in those relatively rare cases where the victim is intentionally locked in the place where he is found and there secretly isolated and confined, a reasonable construction of our kidnapping statute requires an asportation of the victim before the crime of kidnapping is complete. Still to be answered is the extent of the asportation required.

We believe that the history of kidnapping jurisprudence in this country demonstrates the futility of attempting to calculate the requisite asportation in terms of linear measurement. The harm sought to be prevented is not movement of the victim, but his removal from one place to another and attendant increased risks to the victim.[34] The actual distance the victim is transported does not necessarily correspond with the invasion of his physical interest. An asportation of 50 feet may in some cases expose the victim to precisely those abuses which kidnapping statutes are designed to prevent; in other cases, an asportation of 500 feet may alter the victim's situation not at all.

We have concluded that under the kidnapping statute a movement of the victim does not constitute an asportation unless it has significance independent of the assault. And, unless the victim is removed from the environment where he is found, the consequences of the movement itself to the victim are not independently significant from the assault—the movement does not manifest the commission of a separate crime—and punishment for injury to the victim must be founded upon crimes other than kidnapping.

A comprehensive scheme for dealing with this offense rests within the province of the Legislature, not the courts.[35] The standard we apply today does,

[34] Note, A Rationale of the Law of Kidnapping, 53 Colum L Rev 540 (1953); Note, Kidnapping—Movement Incidental to the Commission of a Crime Held Insufficient to Support Indictment for Simple Kidnapping in California, 110 U Pa L Rev 293 (1961); Model Penal Code, Tentative Draft No 11, pp 11–20.

[35] See, for example, the arguments on behalf of a graduated kidnapping statute in both the Michigan Revised Penal Code (Committee Commentary to §§ 2205, 2206, pp 173, 174) and the Model Penal Code (Tentative Draft No 11, comments to § 212.1, pp 11–20). See, also, Note, A Rationale of the Law of Kidnapping, 53 Colum L Rev 540 (1953).

however, discriminate with some certainty between conduct which ought clearly to be punished under the kidnapping statute and conduct which falls within the scope of other crimes.[36]

## V.

### *The standard applied to the facts of this case*

To define "environment" restrictively, *e.g.*, the mere geographic location of the victim, would be to return to the "any movement" concept. The relevant environment is the totality of the surroundings, animate and inanimate.

Applying these criteria to the assault on Inspector Dembosky, we conclude that Adams did not commit the crime of kidnapping. The movement of Inspector Dembosky did not remove him from the prison environment. As his duties customarily took him throughout the entire prison, it cannot be said that moving him from the confused, threatening situation in 4-block to the fifth floor hospital was independently significant from the assault.

The purpose of the movement was neither to avoid detection nor to expose Inspector Dembosky to

[36] While, as Judge Gillis points out, this case does not involve movement of a victim incident to a robbery or rape, it does involve movement incident to a felonious assault which, too, is a separate crime.

Indeed, under Michigan law there is little reason to charge kidnapping where the movement is incidental to an armed robbery or a rape because both of those offenses are punishable by life sentences and in Michigan all sentences, with few exceptions (see fn 41), run concurrently. It is only where the other offense is punishable by a sentence less than life that there is likely to be an issue whether movement incidental to the commission of that offense constituted the separate crime of kidnapping.

Accordingly, the likelihood is that in Michigan kidnapping will be charged for a street assault most frequently where the assailant failed to consummate his objective, the prosecutorial purpose in charging kidnapping being to aggravate the penalty for the unsuccessful attempt. The degree of asportation that should be required to justify a kidnapping prosecution in such a case is beyond the scope of this opinion (see fn 37).

an increased risk of harm. He was moved to reduce the risk of escalation by providing a cooling-off period. When he was first assaulted the inspector asked, "Can't we talk about this?" And, when the group moved off, he suggested that they go to the prison gymnasium. Instead he was required to accompany the assailants to the fifth floor of the prison hospital. This case is not like a case of street assault where the victim is seized on a thoroughfare and pulled into a dark alley or into an automobile to prevent detection so that the assault can be completed in greater privacy; such a movement might have significance independent of the assault.[37]

The evidence does not support a contention that the movement to the fifth floor of the hospital exposed the inspector to an increased risk of harm be-

---

[37] See *People v. Curtis* (1969), 17 Mich App 720; *Wilson v. State* (1970), — Ind — (255 NE2d 817, 821); *Lester v. State* (1970), 9 Md App 542 (266 A2d 361); *Samuels v. State*, fn 33, *supra*.

See, also, for example, the following California Court of Appeals cases holding, in explication of *Daniels*, on the facts presented that movements of victims following assaults on the street might be found by the jury to be kidnapping: *People v. Chavez* (1970), 4 Cal App 3d 832 (84 Cal Rptr 783); *People v. Ramirez* (1969), 2 Cal App 3d 345 (82 Cal Rptr 665); *People v. Thomas* (1970), 3 Cal App 3d 859 (83 Cal Rptr 879); *People v. Ellis* (1971), 15 Cal App 3d 66 (92 Cal Rptr 907); *People v. Moreland* (1970), 5 Cal App 3d 588 (85 Cal Rptr 215).

Contrast *People v. Shells* (1970), 8 Cal App 3d 210 (87 Cal Rptr 255), *leave granted; People v. Schafer* (1970), 4 Cal App 3d 554 (84 Cal Rptr 464).

See, also, *People v. Williams* (1970), 2 Cal 3d 894 (88 Cal Rptr 208, 471 P2d 1008) (victim told to walk away from store premises where robbery occurred; held not to be kidnapping); *People v. Shirley* (1970), 10 Cal App 3d 268 (88 Cal Rptr 853) (secret confinement accompanied by repeated beatings and torture for three days held to be kidnapping). *Cf. People v. Moore* (1970), 13 Cal App 3d 424 (91 Cal Rptr 538); *People v. Cheffen* (1969), 2 Cal App 3d 638 (82 Cal Rptr 658); *People v. Moore* (1970), 4 Cal App 3d 668 (84 Cal Rptr 771).

In *People v. Timmons* (1971), 4 Cal 3d 411 (93 Cal Rptr 736, 482 P2d 648), the California Supreme Court indicated its approval of the decisions of California intermediate appellate courts in *Schafer* and *Ramirez*. See, also, *People v. Mutch* (1971), 4 Cal 3d 389 (93 Cal Rptr 721, 482 P2d 633).

cause it made his rescue more difficult.[38]   Adams and the other men were armed with knives.   There is no evidence, no reason to suppose or infer that they were less likely to use their knives if a confrontation with rescuers had occurred at 4-block than at the fifth floor landing of the hospital.   Might not the presence at 4-block of hundreds of milling men have made rescue there more difficult?   Might not one of the three agitated, perhaps still intoxicated and narcotized, assailants reacted mortally on the spur of the moment to a taunting challenge from an unseen voice in the milling throng?   Under the circumstances we are satisfied that the evidence does not support a finding that the movement had significance adverse to Inspector Dembosky independent of the continuing assault.[39]

The inspector was seized in Jackson Prison.   It is an atypical place, an armed enclosure that no one

[38] Our conclusion that the evidence would not support a finding that the movement of the inspector exposed him to an increased risk of harm makes it unnecessary to appraise the facts in terms of whether the movement *"substantially* increase[d] the risk of harm over that necessarily present" (*People* v. *Daniels, supra* text following fn 33 [emphasis supplied]) in the commission of the assault on Inspector Dembosky.

[39] It is important in this case to make clear what we do not decide as well as what we hold so that our opinion is not misread.

The taking of a hostage may be the offense of kidnapping.   In the hostage situation, if the victim is removed from the environment where he is found, the removal will generally have significance adverse to the victim independent of the assault and the offense of kidnapping will be completed upon his removal from the environment.   Even if the victim is not so removed, if the actor intends to remove him from the environment where he is found and commits an overt act going beyond mere preparation, that would be attempted kidnapping.   If the victim is seized with intent "to extort money or other valuable thing" or to hold the victim "to service against his will" that too *may* be kidnapping even though there has been no asportation (see fn 1; again, we note that Adams was not charged under the second portion of our kidnapping statute).

Nor do we express any opinion as to when a seizure of a person on the street incidental to the commission or attempted commission of another offense (*e.g.,* rape, robbery) becomes the separate offense of kidnapping; see fn 36 and authorities collected in fn 37 and *People* v. *Levy, supra,* text following fn 30.

can enter or leave without passing through guarded entranceways. Movement from one building to another in Jackson Prison, for purposes of the kidnapping statute, is not significantly different than movement from one room to another in a building, especially where, as here, the movement was under surveillance of armed guards who had the enclosure protected and there was no intention on the part of Adams or the other felons themselves to leave or to remove Inspector Dembosky from the prison.

The movement of Inspector Dembosky did not make the apprehension of the felons less likely, nor did the movement make it less likely that the inspector would be released unharmed. It provided a cooling-off period—which Inspector Dembosky himself wisely sought. It provided time for these impetuous, desperate men to reflect and to draw back from worse folly.

Adams' conduct was highly dangerous and indefensible. The prison and prosecutorial authorities are understandably anxious to see that he is severely punished. Prison guards and officials like Inspector Dembosky mingle with frustrated, assaultive, desperate men. An assault upon any of them is a serious breach of discipline; punishment should be clear, certain, and severe.

Michigan, unlike other jurisdictions,[40] does not have a specific statute making assault by a prisoner

---

[40] See, *e.g.*, United States: Mutiny, riot, carrying dangerous instrumentalities in a prison (ten-year sentence), 18 USCA § 1792; Pennsylvania: Taking of a hostage by a prisoner (life sentence), 18 Purdon's Pa Stats Ann § 4723.1; California has a series of statutes: assault with a dangerous weapon by a prisoner not under a life sentence (3 years), 51A West's Ann Calif Code, Penal § 4501; battery on noninmate (one to three years), § 450.15; possession of deadly weapon (three years), § 4502; holding a hostage (five years), § 4503; assault with a deadly weapon by a person under a life sentence (death), § 4500; Missouri: offering violence to guard or another inmate (two to five years), 2 Missouri Revised Statutes, § 216-.460.

on a prison guard or official a crime carrying special penalties. In Michigan, assault upon a prison guard is treated no differently than assault outside of prison walls. The maximum penalties are relatively mild for the kind of aggravated conduct indulged in by Adams and his confederates. That is a good reason for the Legislature to amend the penal code to provide adequate sanctions for an assault by a prisoner. It is not a reason for transforming, without legislative authorization, what under present law may be nothing more than a felonious assault,[41] into an offense which carries with it a possible life sentence.

Criminal statutes, in contrast with the common law, may not be expanded to meet new problems beyond the contemplation of the Legislature when the statute was enacted.[42]

Reversed.

---

[41] MCLA § 750.82 (Stat Ann 1962 Rev § 28.277). The maximum prison sentence is four years. MCLA § 750.503 (Stat Ann 1954 Rev § 28.771). Where a crime is committed in prison, the judge may, in his discretion, direct that the sentence commence forthwith or at the expiration of the sentence which the felon is serving. MCLA § 768.7a (Stat Ann 1954 Rev § 28.1030[1]).

[42] At common law there was a clear distinction between false imprisonment, kidnapping and extortion.

False imprisonment was a common-law misdemeanor and consisted of compelling a person to remain where he is or go somewhere else against his will by an unlawful exercise or show of force. Perkins on Criminal Law (2d ed), p 171.

Kidnapping was aggravated false imprisonment. However, it was also a misdemeanor at common law and consisted of forcible abduction or stealing of a person from his own country and sending him into another. Perkins on Criminal Law (2d ed), p 176.

Comon-law extortion, also a misdemeanor, was the collection of an unlawful fee by an officer under color of office. Perkins on Criminal Law (2d ed), p 367.

These common-law crimes have, in general, been changed by statute.

In addition to extortion by public officers (MCLA § 750.214 [Stat Ann 1962 Rev § 28.411]), it is also extortion to threaten injury to the person or property or mother, father, husband, wife, or child of another with intent to extort money or any pecuniary advantage (MCLA § 750.213 [Stat Ann 1962 Rev § 28.410]); it is a felony

punishable by not more than 20 years' imprisonment or a fine of $10,000.

Perkins says (Perkins on Criminal Law [2d ed], p 372) that statutory extortion is the unlawful extraction of money or other value by means of a threat not sufficient for robbery.

Robbery is the taking from the person of another or in his presence of money or other property which may be the subject of larceny by force and violence or by assault or putting in fear (MCLA § 750.530 [Stat Ann 1954 Rev § 28.798]); and, if committed with a dangerous weapon or any article used or fashioned in a manner to lead the person so assaulted to reasonably believe it to be a dangerous weapon, it is armed robbery. MCLA § 750.529 (Stat Ann 1971 Cum Supp § 28.797).

Under the second part of our kidnapping statute (see fn 1) "seizure" of a person with intent to extort "money or other valuable thing" is kidnapping.

It is apparent from the history of the development of these statutes that kidnapping historically and definitionally is a different crime from false imprisonment or extortion or robbery.

The kidnapping statute is not a catchall, a means of aggravating the penalties—to fill in a gap in the law—so that penalties as severe as those that can be meted out for extortion, armed robbery and kidnapping can be imposed for "extortion" not involving threatened assault on a relative. We may not properly engraft an additional pattern and provide by judicial interpretation that any detention of a person for the purpose of extracting any advantage whatsoever is kidnapping even though there is no meaningful asportation and no secrecy, or that where "extortion" is involved the quality of the asportation required to establish kidnapping need not be of the kind required where extortion is not present even though the offense is not charged under the second part of our kidnapping statute concerning kidnappings "with intent to extort money or other valuable thing".

All the foregoing shows the difficulty of trying to make a statute (enacted in substantially its present form in 1838, RS 1838, part 4, Title 1, ch 3, § 17; CL 1857, § 5735; for present citation see fn 1) designed for one purpose, based upon certain definitional assumptions long established, do another job.

The kidnapping statute may not be applied to any taking of a hostage without regard to whether there is secrecy (see *State* v. *Randall* [1960], 137 Mont 534 [353 P2d 1054] cited by Judge GILLIS) or a legally-significant asportation of the victim.

In the construction of criminal statutes a court is not at liberty to evolve the law much the same as if the court were developing the common law. It is the prerogative of the legislature, not the courts, to define a new crime. "There is no crime whatever punishable by our laws except by virtue of a statutory provision." *In the Matter of Eugene Lamphere* (1886), 61 Mich 105, 108.

"The spirit of the doctrine which denies to the Federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster

BRONSON, J., concurred.

J. H. GILLIS, P. J. (*dissenting*).    Unlike my Colleagues, I am satisfied that there was sufficient evidence from which the jury could lawfully find defendant Adams guilty of kidnaping.    Accordingly, I would affirm defendant's conviction.

In my view, the majority misapply the teachings of such cases as *People* v. *Levy* (1965), 15 NY2d 159 (256 NYS2d 793), *People* v. *Lombardi* (1967), 20 NY2d 266 (282 NYS2d 519), and *People* v. *Daniels* (1969), 71 Cal 2d 1119 (80 Cal Rptr 897).    And, as a result, the majority reach what I consider to be an absurd result.    This case is not one in which the restraint and forcible movement of Inspector Dembosky can be characterized solely as "incident to

of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.    In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."    *Morissette* v. *United States* (1951), 342 US 246, 263 (72 S Ct 240, 249; 96 L Ed 288, 300).

"If there is a gap in the law, the right and the duty, if any, to fill it do not devolve upon the courts.    *  *  *    Crimes are not to be created by inference."    *United States* v. *Laub* (1967), 385 US 475, 486, 487 (87 S Ct 574, 581; 17 L Ed 2d 526, 533, 534).

"Legislative intent is determinable properly by what was at the time of enactment, rather than what might appear a half century later by hindsight."    *Husted* v. *Consumers Power Company* (1965), 376 Mich 41, 54.

An asportation is the gist of the offense of kidnapping.    If we sustain a conviction for kidnapping on evidence that the victim of the confinement has been held a "substantial" period of time and exposed to "serious" risk of harm even though there was not an asportation having significance independent of the assault, then most every assaultive crime can be the capital offense of kidnapping if the prosecutor so charges and a jury so finds.

We acknowledge that we have, indeed, by our construction of Michigan's kidnapping statute defined the crime.    But we have done so in the context that the Michigan Supreme Court has not defined the crime and, unless defined, the statute would be void for overbreadth.    It is the traditional role of the judiciary to pass on the constitutionality of a statute and to construe it, if possible, to preserve its constitutionality.

other crimes and  *  *  *  integral parts of other crimes". *People* v. *Levy*, 15 NY2d at 165 (256 NYS2d at 796). This case does not involve movement of the victim incident to robbery (*People* v. *Levy, supra*; *People* v. *Daniels, supra*); nor does it involve asportation incident to rape (*People* v. *Lombardi, supra*; *People* v. *Daniels, supra*).

In *People* v. *Miles* (1969), 23 NY2d 527, 539, 540 (297 NYS2d 913, 922), the New York Court of Appeals explained the *Levy-Lombardi* rationale as follows:

"In the *Levy* and *Lombardi* cases, and especially in the *Levy* case, the restraint and asportation were parts of the crimes ultimately committed. The robbery and the rapes could not be committed in the forms planned without the limited asportations there involved. Indeed, in any robbery, there is a restraint of 'false imprisonment' and in every rape there is a similar restraint and often removal in some limited sense. It is this kind of factual merger with the ultimate crime of the preliminary, preparatory, or concurrent action that the rule is designed to recognize, and thus prevent unnatural elevation of the 'true' crime to be charged.

*  *  *

"Moreover, *the rule has no purpose of ignoring as independent crimes alternative or optional means used in committing another crime which, by the gravity and even horrendousness of the means used, constitute and should constitute a separately cognizable offense.*

*  *  *

"In short, the *Levy-Lombardi* rule was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal. *It was not designed to merge 'true' kidnappings into other crimes merely because the kidnap-*

*pings were used to accomplish ultimate crimes of lesser or equal or greater gravity.*" (Emphasis supplied.)

Nothing in this record suggests to me an excess of prosecutorial zeal. Accordingly, the *Levy-Lombardi* rule is inapposite. In my view, Adams' conduct could lawfully be considered "true" kidnaping.

In *People* v. *Congdon* (1889), 77 Mich 351, 354, the Michigan Supreme Court noted that the gist of the offense under the kidnaping statute is the involuntariness of the seizure. Similarly, the United States Supreme Court has stated that "the involuntariness of seizure and detention * * * is the very essence of the crime of kidnaping". *Chatwin* v. *United States* (1946), 326 US 455, 464 (66 S Ct 233, 237; 90 L Ed 198, 203). On the facts as recited in the majority opinion, it clearly appears that the jury could find that Inspector Dembosky had been involuntarily seized.

Moreover, "the gravity and even horrendousness", *People* v. *Miles,* 23 NY2d at 539 (297 NYS2d at 922), of Adams' conduct serves to distinguish this case from mere false imprisonment. Inspector Dembosky was confined against his will for a substantial period of time. He was exposed to serious risk of harm. Thus, Inspector Dembosky was subjected to the very abuses the kidnaping statute is intended to prevent. It follows that we should not, as a matter of law, refuse to characterize defendant Adams' conduct as kidnaping. At least, on this record, the jury should be permitted to so find.

I have discovered but two cases which factually resemble this case of *Adams.* In each, a prison guard was forcibly seized and held against his will within the prison by inmates. Jury convictions of kidnaping were affirmed in both cases on the law and

the facts. The evidence was held sufficient to justify the verdicts. See *State* v. *Randall* (1960), 137 Mont 534 (353 P2d 1054), and *State* v. *Frodsham* (1961), 139 Mont 222 (362 P2d 413). See, also, *People* v. *Shaw* (1968), 11 Mich App 255. Such should be the result in this case.

Defendant's other contentions are without merit. His conviction should be affirmed.