## UNITED STATES v. LAUB ET AL.

No. 176.   Argued November 16, 1966.—Decided January 10, 1967.

*Nathan Lewin* argued the cause for the United States. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Yeagley, Kevin T. Maroney* and *Robert L. Keuch.*

*Leonard B. Boudin* argued the cause for appellees. With him on the brief was *Victor Rabinowitz.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

Appellees were indicted under 18 U. S. C. § 371 for conspiring to violate § 215 (b) of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U. S. C.

§ 1185 (b). The alleged conspiracy consisted of recruiting and arranging the travel to Cuba of 58 American citizens whose passports, although otherwise valid, were not specifically validated for travel to that country.[1]

The District Court granted appellees' motion to dismiss the indictment. Chief Judge Zavatt filed an exhaustive opinion (253 F. Supp. 433 (D. C. E. D. N. Y.)). Notice of direct appeal to this Court was filed and we noted probable jurisdiction under 18 U. S. C. § 3731 because the dismissal was "based upon the . . . construction of the statute upon which the indictment . . . is founded." We affirm. Our decision rests entirely upon our construction of the relevant statutes and regulations.

Two statutes are relevant to this case. The first is the Passport Act of 1926, 44 Stat. 887, 22 U. S. C. § 211a. This is the general statute authorizing the Secretary of State to "grant and issue passports." It is not a criminal statute. The second statute is § 215 (b) of the Immigration and Nationality Act of 1952, *supra,* under which the present indictments were brought. Section 215 (b) was enacted on June 27, 1952. It is a re-enactment of the Act of May 22, 1918 (40 Stat. 559), and the Act of June 21, 1941 (55 Stat. 252). It provides that:

> "When the United States is at war or during the existence of any national emergency proclaimed by the President . . . and [when] the President shall find that the interests of the United States require that restrictions and prohibitions . . . be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, *it shall . . . (b) . . . be unlawful for any citizen of the United States to depart from or*

---

[1] In response to a motion for a bill of particulars, the Government alleged that the individuals concerned possessed "unexpired and unrevoked United States passports which . . . had not been specifically validated by the Secretary of State for travel to Cuba."

478

*enter, or attempt to depart from or enter, the United States unless he bears a valid passport."* (Italics added.)

Wilful violation is subjected to a fine of not more than $5,000 or imprisonment for five years, or both.

On January 17, 1953, President Truman made the finding and proclamation required by § 215 (b).[2] As a consequence, a valid passport has been required for departure and entry of United States nationals from and into the United States and its territories, except as to areas specifically exempted by regulations. The proclamation adopted the regulations which the Secretary of State had promulgated under the predecessors of § 215 (b) exempting from the passport requirement departure to or entry from "any country or territory in North, Central, or South America [including Cuba]." 22 CFR § 53.3 (b) (1958 rev.). On January 3, 1961, the United States broke diplomatic relations with Cuba. On January 16, 1961, the Deputy Under Secretary of State for Administration issued the "Excluding Cuba" amendment (22 CFR § 53.3 (1965 rev.), 26 Fed. Reg. 482). That amendment added the two words "excluding Cuba" to the phrase quoted above. Cuba was thereby included in the general requirement of a passport for departure from and entry into the United States.

On the same day, the Department of State also issued Public Notice 179, which stated that "Hereafter United States passports shall not be valid for travel to or in Cuba unless specifically endorsed for such travel under the authority of the Secretary of State. . . ." 26 Fed. Reg.

---

[2] Proclamation No. 3004, 67 Stat. c31, 3 CFR 180 (1949–1953 Comp.). The current "National Emergency" was proclaimed by President Truman on Dec. 16, 1950. Proclamation No. 2914, 64 Stat. A454, 3 CFR 99 (1949–1953 Comp.).

492. It simultaneously issued a press release announcing that:

". . . *in view of the U. S. Government's inability,* following the break in diplomatic relations between the United States and Cuba, *to extend normal protective services to Americans visiting Cuba,* U. S. citizens desiring to go to Cuba must until further notice obtain passports specifically endorsed by the Department of State for such travel. All outstanding passports . . . are being declared invalid for travel to Cuba unless specifically endorsed for such travel. . . . *These actions have been taken in conformity with the Department's normal practice of limiting travel to those countries with which the United States does not maintain diplomatic relations.*" [3] (Italics added.)

In *Zemel* v. *Rusk,* 381 U. S. 1 (1965), the petitioner sought a declaratory judgment that the Secretary of State does not have statutory authorization to impose area restrictions on travel; that if the statute were construed to authorize the Secretary to do, so, it would be an impermissible delegation of power; and that, in any event, the exercise of the power to restrict travel denied to petitioner his rights under the First and Fifth Amendments. This Court rejected petitioner's claims and sustained the Secretary's statutory power to refuse to validate passports for travel to Cuba. It found authority for area restrictions in the general passport authority vested in the Secretary of State by the 1926 Act, relying upon the successive "imposition of area restrictions during both times of war and periods of peace" before and after the enactment of the Act of 1926. 381 U. S., at

---

[3] State Department Press Release No. 24, Jan. 16, 1961, 44 Dept. State Bull. 178. The full text is in the Appendix to this opinion.

8–9. The Court specifically declined the Solicitor General's invitation to rule also that "travel in violation of an area restriction imposed on an otherwise valid passport is unlawful under the 1952 Act." *Id.,* at 12.[4]

We now confront that question. Section 215 (b) is a criminal statute. It must therefore be narrowly construed. *United States* v. *Wiltberger,* 5 Wheat. 76, 95–96, 105 (1820) (Marshall, C. J.). Appellees urge that § 215 (b) must be read as a "border control" statute, requiring only that a citizen may not "depart from or enter" the United States without "a valid passport." On this basis, they argue, appellees did not conspire to violate the statute since all of those who went to Cuba departed and re-entered the United States bearing valid passports. Only if, as the Government urges, § 215 (b) can be given a broader meaning so as to encompass specific destination control—only if it is read as requiring the traveler to bear "a passport endorsed as valid for travel to the country for which he departs or from which he returns"—would appellees be guilty of any violation.

We begin with the fact, conceded by the Government, that "Section 215 (b) does not, in so many words, prohibit violations of area restrictions; it speaks, as the district court noted in the *Laub* case . . . in the language of 'border control statutes regulating departure from and entry into the United States.' " Brief for the United States, p. 11. Nevertheless, the Government requests us to sustain this criminal prosecution and reverse the District Court on the ground that somehow, "the text is broad enough to encompass departures for geographically restricted areas . . . ." *Ibid.* We conclude, however, that in this criminal proceeding the statute cannot be applied in this fashion. Even if ingenuity were able to find concealed in the text a basis for this

---

[4] But cf. *United States* v. *Healy,* 376 U. S. 75, 83, n. 7 (1964).

criminal prosecution, factors which we must take into account, drawn from the history of the statute, would preclude such a reading.

Preliminarily, it is essential to recall the nature and function of the passport. A passport is a document identifying a citizen, in effect requesting foreign powers to allow the bearer to enter and to pass freely and safely, recognizing the right of the bearer to the protection and good offices of American diplomatic and consular officers. See *Urtetiqui* v. *D'Arcy*, 9 Pet. 692, 699 (1835); *Kent* v. *Dulles*, 357 U. S. 116, 120–121 (1958); 3 Hackworth, Digest of International Law 435 (1942). 8 U. S.-C. § 1101 (a)(30).

As this Court has observed, "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law. . . ." *Kent* v. *Dulles, supra,* 357 U. S., at 125. See *Aptheker* v. *Secretary of State,* 378 U. S. 500, 517 (1964); *Zemel* v. *Rusk,* 381 U. S. 1 (1965).

Under § 215 (b) and its predecessor statutes, Congress authorized the requirement that a citizen possess a passport for departure from and entry into the United States,[5] and there is no doubt that with the adoption and promulgation of the "Excluding Cuba" regulation, a passport was required for departure from this country for Cuba and for entry into this country from Cuba. Departure for Cuba or entry from Cuba without a passport would be a violation of § 215 (b), exposing the traveler to the criminal penalties provided in that section. But it does not follow that travel to Cuba with a passport which is not specifically validated for that country is a criminal offense. Violation of the "area restriction"—"invalidating" passports for travel in or to

---

[5] It is the exception rather than the rule in our history to require that citizens engaged in foreign travel should have a passport. *Kent* v. *Dulles,* 357 U. S. 116, 121–123 (1958); Jaffe, The Right To Travel: The Passport Problem, 35 Foreign Affairs 17 (1956).

Cuba and requiring specific validation of passports if they are to be valid for travel to or in Cuba—is quite a different matter from violation of the requirement of § 215 (b) and the regulations thereunder that a citizen bear a "valid passport" for departure from or entry into the United States.

The area restriction applicable to Cuba was promulgated by a "Public Notice" and a press release, *supra,* pp. 478–479, neither of which referred to § 215 (b) or to criminal sanctions. On the contrary, the only reference to the statutory base of the announcement appears in the "Public Notice," and this is a reference to the nonpenal 1926 Act and the Executive Order adopted thereunder in 1938.[6] These merely authorize the Secretary of State to impose area restrictions incidental to his general powers with respect to passports. *Zemel* v. *Rusk, supra.* They do not purport to make travel to the designated area unlawful.

The press release issued by the Department of State at the time expressly explained the action as being "in view of the U. S. Government's inability . . . to extend normal protective services to Americans visiting Cuba." It explained that the action was taken in conformity with the Department's "normal practice" of limiting travel to countries with which we do not have diplomatic relations.[7] That "normal practice," as will be discussed, has not included criminal sanctions. In short, the relevant State Department promulgations are not

---

[6] The "Public Notice" recites that "pursuant to the authority vested in me by Sections 124 and 126 of Executive Order No. 7856, issued on March 31, 1938 (3 FR 681, 687, 22 CFR 51.75 and 51.77) under authority of . . . the Act of . . . July 3, 1926 . . . all United States passports are hereby declared to be invalid for travel to or in Cuba . . . ." Department of State, Public Notice No. 179, Jan. 16, 1961, 26 Fed. Reg. 492.

[7] State Department Press Release No. 24, Jan. 16, 1961, 44 Dept. State Bull. 178. The full text is in the Appendix to this opinion.

only devoid of a suggestion that travel to Cuba without a specially validated passport is prohibited, or that such travel would be criminal conduct, but they also contain positive suggestions that the purpose and effect of the restriction were merely to make clear that the passport was not to be regarded by the traveler in Cuba as a voucher on the protective services normally afforded by the State Department.

This was in keeping with the unbroken tenor of State Department pronouncements on area restrictions. Prior to enactment of § 215 (b) on June 27, 1952, area travel restrictions were proclaimed on five occasions while the 1918 and 1941 Acts were in effect (1918–1921 and 1941–1953).[8] These were the predecessors of § 215 (b), and they similarly specified criminal sanctions.[9] But in each of the five instances, the area restrictions were devoid of any suggestion that they were related to the 1918 or 1941 Acts or were intended to invoke criminal penalties if they were disregarded. They were cast exclusively in civil terms, relating to the State Department's "safe passage" functions.[10] In two of these instances, the Department of State specifically emphasized the civil,

---

[8] The 1918 Act was in effect by Presidential proclamation only between August 8, 1918, and March 3, 1921. (40 Stat. 1829 and 41 Stat. 1359.) The 1941 Act was in effect by successive Presidential proclamations and congressional extensions from November 14, 1941 (55 Stat. 1696), to April 1, 1953 (66 Stat. 57, 96, 137, 333), by which date § 215 (b) was already in effect by Presidential Proclamation No. 3004, Jan. 17, 1953, 67 Stat. c31, 3 CFR 180 (1949–1953 Comp.).

[9] See p. 477, *supra*.

[10] 1. Restriction in 1919 as to Germany (3 Hackworth, Digest of International Law 530 (1942). 2. Restriction in 1950 as to Bulgaria and Hungary (22 Dept. State Bull. 399). 3. Restriction in 1951 as to Czechoslovakia (24 Dept. State Bull. 932). 4. Restriction in 1951 as to Hungary (26 Dept. State Bull. 7). 5. Restriction in 1952 as to East European countries, China, and the Soviet Union (26 Dept. State Bull. 736).

nonprohibitory nature of the restrictions.[11]   For example, in 1952 the State Department issued area restrictions with respect to Eastern European countries, China, and the Soviet Union. The Department's press release emphasized that the "invalidation" of passports for travel to those areas "in no way forbids American travel to those areas." [12]

Since enactment of § 215 (b), the State Department has announced area travel restrictions upon three occasions in addition to Cuba.[13]   Again, although § 215 (b) was fully operative, none of these declarations purported to be issued under that section or referred to criminal sanctions. Each of them, like the Cuba regulation, sounded in terms of withdrawal of the safe-passage services of the State Department.[14]

In 1957, the Senate Foreign Relations Committee asked the Department: "What does it mean when a passport is stamped 'not valid to go to country X'?"   After three months, the Department sent its official reply.   It stated that this stamping of a passport "means that if the bearer enters country X he *cannot be assured of the protection* of the United States.  . . . [but it] *does not necessarily mean that if the bearer travels to country X he will be*

---

[11] These were the 1919 Germany restriction and the 1952 East Europe, Soviet Union, and China restriction. See n. 10, *supra*. The texts of the Department's announcements of these restrictions are in the Appendix to this opinion.

[12] See the Appendix to this opinion.

[13] 1. Restriction in 1955 as to Albania, Bulgaria, China, North Korea, and North Viet Nam (33 Dept. State Bull. 777).   2. Restriction in 1956 as to Hungary (34 Dept. State Bull. 248).   3. Restriction in 1956 as to Egypt, Israel, Jordan, and Syria (35 Dept. State Bull. 756, 21 Fed. Reg. 8577).

[14] In the 1956 area restriction relating to Egypt, Israel, Jordan, and Syria, *supra*, n. 13, as well as the Cuba restriction, the Department expressly recited the 1926 Act as its basis.   It did not mention § 215 (b).   21 Fed. Reg. 8577.

*violating the criminal law.*" [15] (Italics added.) Similarly, in hearings before another Senate Committee, a Department official explained that when a passport is marked "invalid" for travel to stated countries, this means that "this Government is not sponsoring the entry of the individual into those countries and does not give him permission to go in there under the protection of this Government." [16]

Although Department records show that approximately 600 persons have violated area travel restrictions since the enactment of § 215 (b),[17] the present prosecutions are the only attempts to convict persons for alleged area transgressions.[18]

Until these indictments, in fact, the State Department had consistently taken the position that there was no statute which imposed or authorized such prohibition. In the 1957 hearings, referred to above, the Acting Director of the Bureau of Security and Consular Affairs, Department of State, testified that he knew of no statute providing a penalty for going to a country covered by an area restriction without a passport (as distinguished from

---

[15] Hearings before the Senate Committee on Foreign Relations, on Department of State Passport Policies, 85th Cong., 1st Sess. (1957), p. 59.

[16] Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, on the Right To Travel, 85th Cong., 1st Sess., part 2 (1957), p. 86; see also *id.*, at 62.

[17] The Government conceded this to the court below. See also the Department's testimony to the same effect in Hearings before the Subcommittee To Investigate the Administration of the Internal Security Act and Other Internal Security Laws, Senate Committee on the Judiciary, on S. 3243, 89th Cong., 2d Sess. (1966), p. 43. The Chief of the Security Branch of the Legal Division of the State Department testified to the court below that he was unaware of any prosecution for violation of area restrictions under the predecessors of § 215 (b).

[18] See also *Travis v. United States,* No. 67, *post,* p. 491; *Worthy v. United States,* 328 F. 2d 386 (C. A. 5th Cir., 1964).

486

departing or entering the United States).[19]   The Government, as well as others, has repeatedly called to the attention of the Congress the need for consideration of legislation specifically making it a criminal offense for any citizen to travel to a country as to which an area restriction is in effect,[20] but no such legislation was enacted.[21]

In view of this overwhelming evidence that § 215 (b) does not authorize area restrictions, we agree with the District Court that the indictment herein does not allege a crime.   If there is a gap in the law, the right and the duty, if any, to fill it do not devolve upon the courts.

---

[19] Hearings, n. 16, *supra*, at 91–95.

[20] See, *e. g.*, President Eisenhower's request for legislation, H. R. Doc. No. 417, 85th Cong., 2d Sess. (1958).   The Administration's bill was S. 4110, H. R. 13318.   In 1957, the Commission on Government Security, specifically established by Congress to study travel and passport legislation, among other things (Public Law 304, 84th Cong., 1st Sess., 69 Stat. 595 (1955)), recommended that "Title 8, U. S. C. A., section 1185 (b), should be amended to make it unlawful for any citizen of the United States to travel to any country in which his passport is declared to be invalid."   Report (S. Doc. 64, 84th Cong.), at 475.   The next year, the Special Committee To Study Passport Procedures of the Association of the Bar of the City of New York published a report entitled "Freedom To Travel."   One of the authors of this Report was the Honorable Adrian S. Fisher, former Legal Advisor to the Department of State. This Report concluded, at 70, as to criminal enforcement of area restrictions:

·   "The Committee has not discovered any statute which clearly provides a penalty for violation of area restrictions, and this seems to be a glaring omission if the United States is seriously interested in the establishment and enforcement of travel controls.   Knowing violation of valid restrictions should certainly be subject to an effective sanction, which is not now the case."

[21] The most recent bill, introduced by the Department after two years of study, was H. R. 14895, 89th Cong., 2d Sess. (1966).   See Hearings before the Subcommittee To Investigate the Administration of the Internal Security Act and Other Internal Security Laws, Senate Committee on the Judiciary, on S. 3243, 89th Cong., 2d Sess. (1966), p. 73.   Some of the other bills which failed in Congress are discussed in the opinion of the court below.

The area travel restriction, requiring special validation of passports for travel to Cuba, was a valid civil regulation under the 1926 Act. *Zemel* v. *Rusk, supra.* But it was not and was not intended or represented to be an exercise of authority under § 215 (b), which provides the basis of the criminal charge in this case.

Crimes are not to be created by inference. They may not be constructed *nunc pro tunc.* Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach. As this Court said in *Raley* v. *Ohio,* 360 U. S. 423, 438, we may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him." As *Raley* emphasized, criminal sanctions are not supportable if they are to be imposed under "vague and undefined" commands (citing *Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939)); or if they are "inexplicably contradictory" (citing *United States* v. *Cardiff,* 344 U. S. 174 (1952)); and certainly not if the Government's conduct constitutes "active misleading" (citing *Johnson* v. *United States,* 318 U. S. 189, 197 (1943)).

In view of our decision that appellees were charged with conspiracy to violate a nonexistent criminal prohibition, we need not consider other issues which the case presents.

Accordingly, the judgment of the District Court is

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT.

The following three Department of State statements in connection with area restrictions are referred to in the foregoing opinion:

(1) State Department Press Release No. 24, Jan. 16, 1961, 44 Dept. State Bull. 178:

"The Department of State announced on January 16 that in view of the U. S. Government's

inability, following the break in diplomatic relations between the United States and Cuba, to extend normal protective services to Americans visiting Cuba, U. S. citizens desiring to go to Cuba must until further notice obtain passports specifically endorsed by the Department of State for such travel. All outstanding passports, except those of U. S. citizens remaining in Cuba, are being declared invalid for travel to Cuba unless specifically endorsed for such travel.

"The Department contemplates that exceptions to these regulations will be granted to persons whose travel may be regarded as being in the best interests of the United States, such as newsmen or businessmen with previously established business interests.

"Permanent resident aliens cannot travel to Cuba unless special permission is obtained for this purpose through the U. S. Immigration and Naturalization Service.

"Federal regulations are being amended to put these requirements into effect.

"These actions have been taken in conformity with the Department's normal practice of limiting travel to those countries with which the United States does not maintain diplomatic relations."

(2) State Department Press Release No. 341, May 1, 1952, 26 Dept. State Bull. 736:

"The Department of State announced on May 1 that it was taking additional steps to warn American citizens of the risks of travel in Iron Curtain countries by stamping all passports not valid for travel in those countries unless specifically endorsed by the Department of State for such travel.

"In making this announcement, the Department emphasized that this procedure in no way forbids

American travel to those areas. It contemplates that American citizens will consult the Department or the consulates abroad to ascertain the dangers of traveling in countries where acceptable standards of protection do not prevail and that, if no objection is perceived, the travel may be authorized.

"All new passports will be stamped as follows: THIS PASSPORT IS NOT VALID FOR TRAVEL TO ALBANIA, BULGARIA, CHINA, CZECHO-SLOVAKIA, HUNGARY, POLAND, RUMANIA OR THE UNION OF SOVIET SOCIALIST REPUBLICS UNLESS SPECIFICALLY ENDORSED UNDER AUTHORITY OF THE DEPARTMENT OF STATE AS BEING VALID FOR SUCH TRAVEL.

"All outstanding passports, which are equally subject to the restriction, will be so endorsed as occasion permits."

"Freedom to Travel," a 1958 Report of the Special Committee To Study Passport Procedures of the Association of the Bar of the City of New York, characterized this as "an honest admission of the lack of statutory power to enforce an area restriction of this nature." At 70. The Department gave a practical construction of this area restriction in 1954 when it informed two newsmen desiring to travel to Bulgaria that they could go there without a passport and "use, as a travel document . . . an affidavit in lieu of a passport," and that, if Bulgaria would permit them entry, "the Department . . . [would hold] no objection." Hearings on Department of State Passport Policies before the Senate Committee on Foreign Relations, 85th Cong., 1st Sess. (1957), p. 65.

(3) 3 Hackworth, Digest of International Law 530 (1942) (1919 Germany restriction):

"The Department is not now issuing or authorizing issuance or amendment of passports for Ger-

490

many. However, the Department interposes no objection to the entry into Germany of Americans who have important and urgent business to transact there. In view of the present situation, such persons should understand that they go upon their own responsibility and at their own risk. They cannot be guaranteed the same protection which they might expect under normal conditions."