UNITED STATES of America, Plaintiff-Appellee,

v.

John H. THOMAS and Jon-T Farms, Inc., a corporation, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

John H. THOMAS, also known as J. H. Thomas, Defendant-Appellant.

Nos. 78–5249, 78–5374.

United States Court of Appeals, Fifth Circuit.

April 19, 1979.

Travis D. Shelton, Lubbock, Tex., Michael E. Tigar, John J. Privitera, Washington, D.C., for defendants-appellants.

Kenneth J. Mighell, U.S. Atty., Fort Worth, Tex., Bob D. Slough, Asst. U.S. Atty., Lubbock, Tex., for plaintiff-appellee.

Before GEE and VANCE, Circuit Judges, and HUNTER,* District Judge.

GEE, Circuit Judge:

Appellants John Thomas and Jon-T Farms, Inc. were jointly indicted on 44 counts charging violations of 15 U.S.C. § 714m(a) and 18 U.S.C. § 2 (making or causing to be made false statements to the Commodity Credit Corporation [CCC] for the purpose of obtaining payments under the 1972 and 1973 Upland Cotton Allotment programs) and 47 counts charging violations of 15 U.S.C. § 714m(c) and 18 U.S.C. § 2 (causing conversion of CCC property by arranging cotton support payments for persons not qualified to receive them). Appellant John Thomas alone was named in an additional conversion count. After a jury trial, appellants were convicted on all counts, with the exception of one false statement count that was dismissed by the trial judge. Thomas received three-year concurrent sentences on all counts and a $3,000 fine on each false statement count. Jon-T Farms, Inc. was fined $5,000 on each false statement count.

In a second indictment John Thomas individually was charged with four counts of making and causing to be made false tax returns in violation of 26 U.S.C. § 7206(1). After a trial to the court on one count of the indictment, he was found guilty.[1] He was fined $5,000 and received a three-year sentence to run concurrently with the sentences in the cotton case. These two cases have been consolidated for appeal. Appellants challenge the convictions on a host of grounds requiring varying amounts of factual background for proper analysis. We will supply the facts relevant to each issue as we proceed.[2]

With respect to the cotton fraud indictment, appellants first challenge the sufficiency of the evidence to support the jury verdicts on the false statement counts. The cotton fraud indictment is based on appellants' participation in the Upland Cotton Program,[3] which is administered through the Commodity Credit Corporation.[4] In 1970, Congress amended the Agricultural Adjustment Act to provide that no "person" could receive more than $55,000 in any crop year as a price support payment for upland cotton.[5] Congress authorized the Secretary of Agriculture to promulgate regulations defining person and assuring a fair and reasonable application of the payment limitation.[6] The regulations in effect in 1972 and 1973 provided that each individual entitled to share in the proceeds of a joint venture farming operation would be considered a separate person for the purpose of applying the payment limitation as long as the individual was actively engaged in the farming operations of the joint venture, by capital contribution or otherwise. 7 C.F.R. § 795.6 (1973).[7] The regulations also provided that if the land was custom farmed,[8] the custom farmer would not be considered a separate person from the person for

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. The remaining three counts of the tax indictment were subsequently dismissed upon motion by the government.

2. Because of the concurrent sentence doctrine, the legal and factual issues will be discussed only to the extent that they concern the false statement and tax fraud convictions. *See* note 24, *infra.*

3. The Upland Cotton Program is fully explained in *United States v. Clark*, 546 F.2d 1130, 1132 (5th Cir. 1977).

4. *See* Agricultural Adjustment Act of 1970, Tit. VI, § 602(e)(10), 84 Stat. 1377 (1970) (current version 7 U.S.C. § 1444(e)(10) (1973)).

5. Agricultural Adjustment Act of 1970, Tit. I, § 101(1), 84 Stat. 1358 (1970) (current version at 7 U.S.C. § 1307(1) (Supp.1978)).

6. Agricultural Adjustment Act, Tit. I, § 101(4), 84 Stat. 1359 (1970) (current version at 7 U.S.C. § 1307(4) (Supp.1973)).

7. 35 Fed.Reg. 19340 (1970), *amended,* 36 Fed. Reg. 25210 (1971).

8. Custom farming is the performance of farming services for hire with remuneration on a unit-of-work basis.

whom he was performing the custom farming if the custom farmer had either a direct or an indirect interest in the farm as landowner, landlord, or in any other similar capacity. 7 C.F.R. § 795.15 (1973).[9] The regulations further provided that any changes in farming operations by lease or otherwise would be disregarded for the purpose of applying the payment limitation unless the changes were bona fide, substantive, and legally binding. 7 C.F.R. § 695.13 (1973).[10]

Jon-T Farms, Inc. is a wholly owned subsidiary of Jon-T Chemicals, in which appellant Thomas is the majority stockholder. Under the new regulations, Jon-T Farms was no longer eligible for price support payments for its entire farming operation. Consequently, the corporation leased most of its land to two joint ventures, Gaines County Farms (GCF) and Gaines County Joint Venture (GACO). Thomas recruited business associates and employees to become members of the joint ventures.[11] Generally, each venturer signed a personal note at a bank selected by Thomas, a power of attorney, ASCS Form 516 (Intention to Participate and Payment Application), ASCS Form 36 (Assignment of Payment), a joint venture agreement, and a lease. C. R. Bruce was selected to custom farm the land for both joint ventures. Based on Jon-T Farms' submission of ASCS Forms 516 and 580,[12] each joint venturer received a cotton price support payment of approximately $53,000 from the government in 1972 and in 1973. The jury found appellants guilty on 43 false statement counts based on the submission of Form 516 in 1972 and 1973 and Form 580 in 1973. The false statement counts were prosecuted on the theory that appellants made false statements to the CCC by the submission of the forms applying for payments in the name of each joint venturer and certifying compliance with the Upland Cotton Program when appellants knew that the joint venturers were not entitled to receive the payments because they were not involved in a bona fide and substantive joint venture farming operation separate and apart from appellants as required by the regulations.

■ Appellants claim that the evidence established that the joint venturers were entitled to receive payments because the operation was in fact in compliance with the regulations. The government responds that the joint venture operations were not in compliance in two respects. First, the government contends that the paper structures were shams rather than bona fide and substantive changes in appellants' farming operations. Second, the government claims that Bruce was an employee of Jon-T rather than an independent contractor; therefore, the joint venturers were not separate persons under the regulations because their custom farmer had an interest in the land farmed.

Viewed in the light most favorable to the government,[13] the evidence established that, although the paper structures created by appellants were in compliance with the regulations, the appellants did not act in accordance with the paper structures. On paper, there were two separate entities, GACO and GCF, but the entities were not treated as separate and distinct by the parties. At the direction of Thomas, the cotton crops from the two joint ventures were combined, and the profits or losses were apportioned among the total number of joint venturers in the operation. According to the paper structures, all management and operation decisions required the agreement of a majority of the joint venturers. But the record reflects that virtually all decisions were made solely by John Thomas. The profits and losses of each joint venture

9. 35 Fed.Reg. 19341 (1970), *amended,* 36 Fed. Reg. 25210 (1971).

10. 35 Fed.Reg. 19340 (1970), *amended,* 36 Fed. Reg. 25210 (1971).

11. Appellants were not themselves members of either joint venture.

12. ASCS Form 580 was a Report of Acreage and Certification of Compliance.

13. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

were supposed to be shared equally by its members, but neither profits nor losses were shared equally. In 1973, Thomas directed that $3,000 in profits be distributed only to those members of the joint ventures who were also employees of Jon-T; those members of the joint ventures who were not Jon-T employees received nothing.[14] Whenever a joint venturer withdrew from the operation, the loss was apportioned among the remaining joint venturers instead of requiring the withdrawing venturer to pay his proportionate share of the losses to the date of withdrawal. From this evidence, together with other evidence too extensive to discuss, the jury was entitled to conclude that the joint ventures were in fact shams rather than bona fide and substantive joint ventures.

There was also sufficient evidence to support a jury conclusion that Jon-T was performing the custom farming for the joint ventures through its employee C. R. Bruce. Although Bruce was ostensibly an independent contractor working for the joint ventures and there is some evidence to support such a characterization,[15] the evidence as a whole indicated that he was actually a Jon-T employee. There is really no other reasonable explanation for Jon-T's extensive involvement with Bruce. Jon-T provided a large amount of the equipment used by Bruce and paid the fuel bills for the custom farming operation. Jon-T hired a person whose full-time responsibility was to oversee the custom farming operation. Bruce's bank statements were regularly sent to Jon-T for reconciliation, and Bruce and his bookkeeper, selected by Jon-T, were carried on Jon-T's payroll health insurance plan. Bruce was authorized to purchase Jon-T stock by a corporate resolution designating him as a key and valuable employee.[16] There is ample evidence to support the jury's conclusion that Jon-T was performing the custom farming for the joint ventures through its employee C. R. Bruce.

■ Under either theory, therefore, and despite the considerable amount of conflicting evidence in the case, we must agree with the government that the evidence was sufficient to support the jury's ultimate conclusion that the statements were in fact false because the joint venturers were not entitled to receive government payments.[17]

14. This imbalance in profit sharing was later corrected, although not until after the government began its investigation of the operation.

15. Jon-T did not treat Bruce as an employee for income tax withholding purposes. Bruce owned some of his own equipment, and he carried approximately 50 persons on his payroll.

16. Aside from the children of John Thomas and the children of another Jon-T stockholder, only officers, directors, and employees of Jon-T were permitted to purchase Jon-T stock.

17. Appellants also contend that the false statement counts based on Form 516 must be reversed for three additional reasons. First, they contend that criminal liability cannot attach because the statements on Form 516 are literally true. This argument is foreclosed by our holding in *United States v. Clark*, 546 F.2d 1130, 1134 (5th Cir. 1977).

Second, they contend that the statements made on Form 516 are not material because the submission of Form 516 alone cannot induce payment. This argument is also without merit. Although the submission of Form 516 alone cannot induce payments, Form 516 is an integral step in the payment process, and payments are not made unless both Forms 516 and 580 are filed in the ASCS office. Third, appellants argue that the false statement counts based on Form 516 are barred by principles of res judicata. They contend that the government is attempting to relitigate issues already conclusively determined between the parties because the false statement counts based on Form 516 set out in the second cotton fraud indictment are not materially different from those set out in the first indictment, which was dismissed for failure to identify the false statement allegedly made "on" Form 516. Appellants' argument might be meritorious were it true that the false statement charges in the two indictments were materially indistinguishable. But the false statement counts in the second indictment contained two clarifying changes sufficient to bar the application of res judicata. The second indictment alleged that the false statements were made "by the submission" of the form rather than "on" the form, as alleged in the first indictment, and the second indictment included reasons why the named persons were not entitled to payments. In combination, these two changes clarified the government's false statement theory, remedying any supposed defect the trial judge had found in the prior indictment.

Appellants next argue that the imposition of criminal liability in the cotton fraud case is not in accordance with the doctrine of strict construction of criminal statutes.[18] *See, e. g., United States v. Laub*, 385 U.S. 475, 480, 87 S.Ct. 574, 577, 17 L.Ed.2d 526 (1967). Appellants' argument on this issue is very narrow. They do not challenge the Secretary's authority to issue the regulations nor do they challenge the potential applicability of 15 U.S.C. § 714m as an enforcement mechanism for these regulations. Instead, they contend only that, strictly construed, the statutory and regulatory scheme then in existence did not unequivocally provide for criminal liability for violations of payment limitations. During the years in question, 7 C.F.R. § 795.16 (1973)[19] provided that cotton payments could be withheld or a refund required if the applicant participated in a scheme to evade the payment limitations.[20] Similarly, language on ASCS Form 516 and in an ASCS brochure warned that false certifications might result in the loss of program benefits.[21] From this language, appellants infer that criminal liability should not have attached upon violations of the regulations. Appellants' argument is without merit. The statutory and regulatory scheme clearly provided for the imposition of criminal liability. Congress imposed the payment limitation, authorized the Secretary of Agriculture to issue regulations assuring a reasonable application of the limitation, and directed that the program be administered through the Commodity Credit Corporation, which had long been under the protection of criminal fraud statutes (15 U.S.C. § 714m).[22] In the face of this statutory framework, we cannot accept appellants' argument that under the doctrine of strict statutory construction the imposition of additional civil administrative sanctions by regulation must be read as the negation of statutory criminal liability for fraud.[23]

Appellants also argue that six of the conversion counts were improperly joined with the remaining counts under Federal Rules of Criminal Procedure 8 and, alternatively, that the district judge abused his discretion in failing to grant a severance for prejudicial joinder under Federal Rules of Criminal Procedure 14. We reject both contentions. Joinder was proper because both defendants participated in a series of acts or transactions constituting offenses "so closely related in time, place, and/or manner as to show a connection between

---

18. Criminal sanctions were in fact imposed under identical circumstances in *United States v. Clark*, 546 F.2d 1130 (5th Cir. 1977), but this precise issue apparently was not raised in that case.

19. 35 Fed.Reg. 19341 (1970).

20. The regulations were subsequently amended to provide that this refund liability was supplemental to criminal and civil fraud liability. 7 C.F.R. § 795.20 [39 Fed.Reg. 15024 (1974)]. Although appellants characterize this amendment as a change, it is more than likely a clarification. The Secretary listed the changes in a foreword without any mention that there was a change in liability. 39 Fed.Reg. 7943 (1974). Surely such an important change would have merited mention.

21. Appellants apparently overlooked the language on ASCS Form 580 that specifically warned of criminal liability.

22. *See* notes 4, 5, 6, *supra*, and accompanying text.

23. Appellants' reliance on *United States v. Laub, supra,* is misplaced. In *Laub* the Supreme Court held that the violation of an area restriction imposed by the Secretary of State was not criminally punishable. Although there is language in *Laub* favorable to appellants' position, the distinctions between *Laub* and the instant case are crucial. In *Laub* the decision was based on the interaction of two factors: first, it was doubtful that the criminal statute authorized the imposition of area restrictions imposed by the Secretary under other statutes; and second, the Secretary had provided "authoritative assurance that punishment [would] not attach." 385 U.S. at 487, 87 S.Ct. at 581. In this case (1) the appellants do not challenge the statutory authority of the Secretary to issue the regulations or to enforce them under the criminal statutes applicable to the Commodity Credit Corp., and (2) the language of the Secretary of Agriculture pointed to by appellants cannot be characterized fairly as "authoritative assurance that punishment [would] not attach" to violations of the payment limitation regulations, especially in view of the explicit language in ASCS Form 580 warning of criminal liability. *See* note 21.

them." 8 *Moore's Federal Practice* § 8.06[2] at 8–34 (2d ed. 1978). *See United States v. Laca,* 499 F.2d 922, 925 (5th Cir. 1974). Motions for severance are addressed to the sound discretion of the trial court, and his decision will not be overturned on appeal absent a showing of prejudice. *United States v. Laca, supra.* Appellants have not carried their burden of demonstrating prejudice.

■ We have carefully considered appellants' other challenges to their convictions based on the false statement counts, and we find them without merit. Exercising our discretion under the concurrent sentence doctrine, we decline to address appellants' challenges relating solely to the convictions based on the conversion counts. *See, e. g., United States v. Binetti,* 547 F.2d 265, 269 (5th Cir.), *rev'd on other grounds,* 552 F.2d 1141 (1971).[24]

■ Appellant Thomas claims a due process violation in connection with the criminal tax indictment. He contends that the Internal Revenue Service violated its own regulations governing criminal tax investigations by its failure to notify him of the investigation and its failure to afford him a conference concerning the alleged tax violations. He relies on 26 C.F.R. § 601.-107(b)(2), which provides that "[a] taxpayer who may be the subject of a criminal recommendation will be afforded a district intelligence conference when he requests one . . . . :"

The rule cited by appellant applies to criminal investigations conducted by the IRS. In this case, the grand jury both originated and conducted the criminal tax investigation; the Internal Revenue Service was involved only tangentially. Although the rule is published in the Federal Register and codified in the Code of Federal Regulations, it is not an officially promulgated regulation but only a statement or procedure. Mertens, *Law of Federal Income Taxation,* Regulations, *Internal Revenue*

*Service Operations,* p. 3 (1977). We are not prepared to hold that such a rule was intended to curtail the plenary power of the grand jury to indict for any crime within its jurisdiction. *See Sullivan v. United States,* 348 U.S. 170, 173, 75 S.Ct. 182, 184, 99 L.Ed. 210 (1954); *United States v. Hayes,* 589 F.2d 811, 818 (5th Cir. 1979).

Even if the rule were applicable to investigations initiated and conducted by the grand jury, it is not at all clear that any violations occurred. The rule does not require that a taxpayer be notified of an investigation, nor does it require that a conference be afforded in the absence of a request. Thomas concededly did not request a conference. Furthermore, Thomas was not in any way prejudiced by the failure of the IRS to afford him a conference, and his due process rights were adequately protected by trial. *See United States v. Goldstein,* 342 F.Supp. 661 (E.D.N.Y.1972).

■ Appellants also challenge the government's conduct with respect to an alleged plea agreement that is the subject of much dispute. Over a period of nine months, appellants negotiated with government attorneys concerning the disposition of the criminal cotton fraud case. A partial agreement was reached with Justice Department attorneys in December 1976 that Thomas would enter four nolo contendere misdemeanor pleas for conversion, and the corporation would enter one nolo contendere felony plea for making a false statement. Only one question was left open at that time—whether the agreement would include a preplea conference with the court. After further negotiations, the appellants allegedly decided to accept the plea agreement on the government's terms, i. e., without the preplea conference, but that decision apparently was not communicated to the government.

When events were at this stage, the government informed appellants that the grand jury was about to return a tax indict-

---

**24.** Here, as in *Binetti,* "prejudice is not apparent and the possibility of adverse collateral consequences appears to be remote." 547 F.2d at 269. It also appears that the unreviewed convictions will not increase Thomas' severity rating under the Parole Commission guidelines, 28 C.F.R. § 2.20 (1978). *See United States v. Rubin,* 591 F.2d 278 at 281 (5th Cir. 1979).

ment against Thomas.[25] This information came as a complete surprise to the appellants, who were unaware that the government had been pursuing a tax investigation of Thomas. Appellants maintained that the contemplated tax indictment was an anticipatory breach of the alleged plea agreement and consequently refused to proceed with the agreement.

In this unusual posture, appellants are now seeking specific performance of the alleged plea bargain. Though the issue suggests a number of novel questions, it is easily resolved on traditional grounds. Appellants' argument is viable only if we agree that the filing of the tax indictment was a breach of the proposed plea bargain. Appellants assert that they believed that the plea bargain would dispose of all criminal matters then under investigation. But in determining the scope of a plea bargain, we cannot use a subjective standard. *See Johnson v. Beto*, 466 F.2d 478, 479 (5th Cir. 1972). The test, as applied to this particular issue, is whether "the evidence viewed objectively would lead one in the position of the defendants to reasonably conclude that the [nolo] pleas would be fully dispositive of all federal criminal matters." *United States v. Minnesota Mining & Manufacturing Co.*, 551 F.2d 1106 (8th Cir. 1977). Although we do not doubt that appellants would have liked for the plea agreement to dispose of all criminal matters then under investigation, we cannot conclude that such an expectation was reasonable viewing the evidence objectively. The tax fraud charges are totally unrelated to the cotton fraud charges, appellants were not even aware of the ongoing tax investigation, and no government attorney ever mentioned possible tax charges in the negotiation process. While the question might be closer were the tax charges related to the cotton charges, it is inconceivable that Thomas could reasonably conclude that a plea bar-

gain relating to cotton fraud charges would dispose of totally unrelated tax charges. Since we find that the tax matters were not within the scope of the proposed plea agreement, appellants' contention that the government breached the agreement by filing the tax indictment must fail.

■ Appellants next contend that the indictments must be dismissed because the government violated Federal Rule of Criminal Procedure 6(e), which governs the secrecy of grand jury proceedings. In this case grand jury material was disclosed to special agents of the Internal Revenue Service and the Department of Agriculture, who were working under the control and direction of the United States attorney in the investigation of this case. Appellants argue that the version of Rule 6(e) then in effect[26] prohibited the disclosure of grand jury material to persons other than government attorneys. This argument is foreclosed by our opinion in *United States v. Evans*, 526 F.2d 701, 707 (5th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976), interpreting the former version of Rule 6(e). We there held that "[r]epresentatives of government agencies actively assisting United States Attorneys in a grand jury investigation and working under their direction may lawfully have access to grand jury material in the performance of their duties." *See also In re William H. Pflaumer & Sons, Inc.*, 53 F.R.D. 464 (E.D.Pa.1971). Moreover, appellants make no claim of prejudice, nor do they make a showing of abuse of the grand jury process by the government. Even assuming that Rule 6(e) was somehow violated, dismissal of the indictment would not be the appropriate remedy in these circumstances. *United States v. Malatesta*, 583 F.2d 748, 753–54 (5th Cir. 1978), *modified en banc on other grounds*, 590 F.2d 1379 (Mar. 12, 1979).

■ Appellants also contend that the conversion counts and the tax counts must

---

**25.** The tax indictment was based on Thomas' deduction of gambling losses as business expenses.

**26.** Rule 6(e) has since been amended to make it clear that government personnel may have ac-

cess to grand jury material when they are assisting a government attorney in the performance of his duty to enforce federal criminal law. Fed.R.Crim.P. 6(e) (Supp. 1978).

be dismissed because of prosecutorial vindictiveness. Appellants were originally charged in a 72-count indictment based almost entirely on 15 U.S.C. § 714m(a) (false statements).[27] The district judge dismissed all but three of the counts on appellants' motion alleging that the indictment was not sufficiently specific. The remaining three counts were dismissed upon motion of the government. Appellants were subsequently reindicted on 92 counts in the cotton case, 48 of which were based on 15 U.S.C. § 714m(c) (conversion), and Thomas alone was indicted on four counts in the tax case. Appellants contend that the conversion and tax counts were added in retaliation for the exercise of their constitutional right to be sufficiently apprised of the charges against them. Appellants rely on *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), in which the Supreme Court held that it was constitutionally impermissible, even absent a showing of actual vindictiveness, for a prosecutor to substitute a more severe charge after a defendant exercised his statutory right to a trial de novo.[28] The Supreme Court's holding in *Blackledge v. Perry* was interpreted most recently by this circuit in *Jackson v. Walker*, 585 F.2d 139 (5th Cir. 1978). After extensive analysis, which we need not reiterate here, the *Jackson* panel concluded that "[i]n deciding whether to require a showing of actual vindictiveness or merely a showing of reasonable apprehension of vindictiveness, a court must weigh the extent to which allowing

the second indictment will chill the exercise of the defendants' [due process] rights against the extent to which forbidding the second indictment will infringe on the exercise of the prosecutor's independent discretion." *Id.* at 145.

Turning to the facts in this case, we first note that because of the concurrent sentence doctrine, we decline to consider appellants' argument with respect to the conversion counts. *United States v. Binetti, supra.* With respect to the tax count,[29] we need not undertake a detailed analysis using the *Jackson* balancing test because of our decision in *Hardwick v. Doolittle*, 558 F.2d 292 (5th Cir. 1977), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 58 L.Ed.2d 801 (1978). We there held that when a prosecutor adds a new charge for relatively distinct criminal conduct that occurred in the same "spree of activity," defendant's due process rights are offended only if there is actual vindictiveness as opposed to the mere apprehension of vindictiveness. The countervailing prosecutorial interest here is even more pronounced than in *Hardwick* because the new charge is not based on the same "spree of activity." Therefore, following *Hardwick*, we hold that although appellant Thomas has established a prima facie case of prosecutorial vindictiveness with respect to the tax count, we must remand to the district court to afford the prosecutor an opportunity to present countervailing evidence.[30]

27. The indictment named both appellants in 71 false statement counts and Thomas alone in one embezzlement count based on 15 U.S.C. § 714m(b).

28. Although a *Blackledge* challenge has not yet occurred in a situation in which the defendant complained of retaliation for the exercise of his constitutional right to be sufficiently apprised of the charges against him, we cannot imagine that such a right should not be accorded the same stature as a defendant's statutory right to a trial de novo. Other rights that have been protected from prosecutorial vindictiveness include the right to petition for a writ of habeas corpus, *Colon v. Hendry*, 408 F.2d 864 (5th Cir. 1969), the right of direct appeal, *United States v. Jackson*, 585 F.2d 139 (5th Cir. 1978), the right to enter a special plea of insanity, coupled with the right to remove to federal court, *Hard-*

*wick v. Doolittle*, 558 F.2d 292 (5th Cir. 1977), cert. denied, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978), and, at least in some situations, the right to plead not guilty, *United States v. Jones*, 587 F.2d 802 (5th Cir. 1979) (by implication); *cf. Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

29. Appellant Thomas was convicted on only one tax count. The remaining three counts were dismissed upon motion by the government.

30. In its brief, the government attempts to rely on the "newly discovered evidence" explanation suggested by *Hardwick*. Although it may be true that the evidence establishing the tax violation was not secured until March 1977, the government offers no explanation for its decision to initiate a tax investigation for the years

For reasons stated above, the judgment in No. 78–5249 is affirmed, and No. 78–5374 is remanded to the district court for proceedings consistent with this opinion.

AFFIRMED IN PART, REMANDED IN PART.

1972 and 1973 after Thomas successfully challenged the sufficiency of the first cotton indictment in 1975.